**FOR PUBLICATION**

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

THE ISLAMIC SOCIETY OF BASKING
RIDGE, et al.,

               Plaintiffs,

         v.

TOWNSHIP OF BERNARDS, et al.,

               Defendants.

Civil Action No. 16-1369 (MAS) (LHG)

**OPINION**

**SHIPP, District Judge**

     This matter comes before the Court on Plaintiffs The Islamic Society of Basking Ridge ("ISBR") and Mohammad Ali Chaudry, Ph.D.'s ("Dr. Chaudry") (collectively, "Plaintiffs") Motion for Partial Judgment on the Pleadings. (ECF No. 29.) Defendants Township of Bernards ("Bernards Township" or "Township"),[1] Bernards Township Planning Board ("Planning Board" or "Board"),[2] Bernards Township Committee,[3] Barbara Kleinert, Jeffrey Plaza, Jim Baldassare,

---

[1] The Township of Bernards ("Township") is a "municipality, chartered under the laws of the State of New Jersey, and located in Somerset County, New Jersey." (Compl. ¶ 26, ECF No. 1; Answer ¶ 26, ECF No. 15.)

[2] "Defendant Bernards Township Planning Board . . . is an agency of the Township Committee . . . ." (Compl. ¶ 29; Answer ¶ 29.) "The Board is charged by the Township with reviewing subdivisions, site plans, planned developments, conditional uses, and certain variances." (Compl. ¶ 29; Answer ¶ 29.) "The Board also reviews and recommends revisions to the land use ordinance to the Committee." (Compl. ¶ 29; Answer ¶ 29.) "The Board shares jurisdiction over administration and application of the Township's zoning ordinance with the Township's Zoning Board of Adjustment . . . ." (Compl. ¶ 29; Answer ¶ 29.) "Defendants Barbara Kleinert, Jeffrey Plaza, Jim Baldassare, Jodi Alper, John Malay, Kathleen 'Kippy' Piedici, Leon Harris, Paula Axt, Randy Santoro, Rich Moschello, and Scott Ross are all members of the Board . . . ." (Compl. ¶ 30; Answer ¶ 30.)

[3] "Defendant Bernards Township Committee . . . is the legislative and executive body of the Township." (Compl. ¶ 27; Answer ¶ 27.) "Defendants Carol Bianchi, Carolyn Gaziano, Thomas S.

Jodi Alper, John Malay, Kathleen "Kippy" Piedici, Leon Harris, Paula Axt, Randy Santoro, Rich Moschello, Scott Ross, Carol Bianchi, Carolyn Gaziano, Thomas S. Russo, Jr., and John Carpenter (collectively, "Defendants") opposed (ECF No. 46), and Plaintiffs replied (ECF No. 51).   The Court has carefully considered the parties' submissions and heard oral argument on December 20, 2016.  For the reasons stated below, Plaintiffs' Motion is **GRANTED**.

## I.    Summary of the Court's Opinion

This case requires the Court to examine a township planning board's denial of a Muslim congregation's site plan application to build a mosque. (*See* Compl. ¶ 1, ECF No. 1.)  In the instant Motion, Plaintiffs challenge the Planning Board's decision on two bases: (1) Defendants' disparate application of an off-street parking requirement between Christian churches and Muslim mosques, pursuant to the Religious Land Use and Institutionalized Persons Act ("RLUIPA"); and (2) the purported unconstitutional vagueness of a parking ordinance ("Parking Ordinance") under the Federal and New Jersey Constitutions.  After careful consideration, the Court determines that Plaintiffs are entitled to judgment on the pleadings with regard to both issues.

The Bernards Township Parking Ordinance sets forth a 3:1 ratio, between seats and parking spaces, as an acceptable standard for "churches."  The Parking Ordinance, by reference, provides a definition of "churches" that includes mosques, yet Defendants have applied their own unsubstantiated interpretation that the term "churches" exclusively refers to Christian churches and not Muslim mosques.  Based on their review of the application and relevant evidence, Defendants required ISBR to construct parking spaces far exceeding the 3:1 ratio afforded to Christian churches.

---

Russo, Jr., John Malay, and John Carpenter are all currently members of the Committee . . . ." (Compl. ¶ 28; Answer ¶ 28.)

Defendants' rationale for their decision was primarily based on: (1) a 2010 informational report that set forth varying traffic needs depending on the type of religious institution at issue; and (2) testimony from an expert hired by a local community organization. Here, Plaintiffs' principle challenge arises from Defendants' initial determination that the 3:1 ratio for "churches" was a separate standard exclusively reserved for Christian churches. The *method* by which Defendants disparately treated ISBR's application—i.e., by incorporating a report—does not negate Plaintiffs' discrimination claim. Defendants' interpretation of the Parking Ordinance's text plainly distinguishes between houses of worship based on religious affiliation. Accordingly, Defendants' application of the Parking Ordinance violates RLUIPA's Nondiscrimination Provision, which strictly prohibits express discrimination on the basis of religion.

While local zoning boards generally retain substantial discretion in their ability to consider traffic, aesthetic, and other local community needs, RLUIPA codifies narrow exceptions that apply where a zoning board's conduct infringes upon First Amendment religious rights. Here, Plaintiffs have raised a valid challenge under one of RLUIPA's narrow, yet highly protective, provisions— the Nondiscrimination Provision. This Provision applies strict liability toward laws and the application of laws that lack neutrality and general applicability with regard to religion. Accordingly, the Court does not consider Defendants' attempt to justify their conduct as necessary to further the township's interest in regulating local traffic and parking. Viewing the pleadings in the light most favorable to Defendants, the Court, therefore, finds that Defendants' application of the Parking Ordinance's 3:1 ratio for "churches" constitutes impermissible discrimination on the basis of religion.

As to Plaintiffs' related assertion of unconstitutional vagueness, Plaintiffs identify provisions within the Parking Ordinance that grant the Planning Board impermissible discretion as applied to religious institutions. The challenged provisions permit the Planning Board to require

off-street parking spaces beyond the 3:1 ratio for "churches" "to ensure that the parking demand will be accommodated by off-street spaces." Bernards Twp. Ord. § 21-22.1. Given that the challenged portions of the Parking Ordinance implicate First Amendment rights, the Court applies a stringent vagueness test.

According to Defendants, the challenged provisions are sufficiently clear because the Parking Ordinance sets forth a 3:1 ratio for "churches," and only permits discretion "to ensure that the parking demand will be accommodated by off-street spaces." Bernards Twp. Ord. § 21-22.1. Neither proffered standard, however, constitutes a guideline for measuring the need for off-street parking. Given that Plaintiffs' vagueness challenge arises from the Board's unlimited discretion to disregard the 3:1 ratio, the fact that the Parking Ordinance contains the 3:1 ratio is inconsequential. Similarly, the stated goal of ensuring sufficient off-street parking fails to provide any standard for measuring the amount of parking to require from applicants.

Defendants also contend that their discretion is sufficiently constrained by the requirement that Defendants accept, and base their decisions on, applicants' submitted evidence. Absent explicit criteria to determine applicants' parking needs, however, Defendants' assurances are illusory. Defendants retain unfettered discretion to disregard evidence adverse to their views and can require applicants to submit specific evidence that Defendants can later reference to justify discriminatory decisions. Accordingly, the Court determines that the challenged portions of the Parking Ordinance lack sufficient standards to prevent arbitrary and discriminatory enforcement.

For these reasons, the Court **GRANTS** Plaintiffs' Motion for Partial Judgment on the Pleadings.

## II.    Background[4]

This case arises from the purported religious discrimination by Bernards Township against a local Islamic society, ISBR, in connection with a site plan approval application to build a mosque. Defendants allegedly engaged in impermissible discriminatory conduct following receipt of ISBR's April 20, 2012 application, until they ultimately denied ISBR's application on January 19, 2016. (Compl. ¶¶ 15, 123; Answer ¶¶ 15, 62, 123.)  In response, ISBR and its President, Dr. Chaudry, filed the instant eleven-count action arising under RLUIPA, the First, Fifth, and Fourteenth Amendments of the United States Constitution, and the New Jersey Constitution. (Compl. ¶¶ 308-80.)

The parties filed their respective pleadings and Plaintiffs now move for partial judgment on the pleadings as to Counts Three (on the issue of parking), Eight, and Ten.  Count Three alleges that Defendants violated RLUIPA's prohibition against government entities "imposing or implementing land use regulations in a manner that discriminates against any assembly or institution on the basis of religion or religious denomination" ("Nondiscrimination Provision"). (Compl. ¶ 321.)    Count Eight alleges that the Parking Ordinance[5] violates the Fourteenth Amendment's Due Process Clause because it "fail[s] to provide people of ordinary intelligence a reasonable opportunity to understand the conduct governed by the statute . . . [and] authorize[s] or encourage[s] arbitrary and discriminatory enforcement." (Compl. ¶¶ 356-61.)  Finally, Count Ten alleges that the Township's Parking Ordinance violates Article I of the New Jersey Constitution,

---

[4] In light of the standards set forth in Federal Rule of Civil Procedure 12(c), and unless otherwise noted, the Court sets forth factual allegations set forth by Defendants' Answer, or facts to which Defendants have admitted in their Answer, either in express terms or by Defendants' failure to respond. Additionally, the Court does not adopt the parties' admissions to conclusions of law.

[5] For the sake of clarity, the Court notes that the Parking Ordinance is one section of the code of Bernards Township ordinances.  The Court's Opinion specifically refers to the Parking Ordinance when applicable and refers to the Township Ordinance when citing the entire Bernards Township Ordinance code or to a section distinct from the Parking Ordinance.

which "seeks to protect against injustice and safeguard the principles of due process." (Compl. ¶¶ 370-75.)

### A.   ISBR Purchases Property to Build a Mosque

On November 9, 2011, with the goal of building a mosque, Plaintiffs purchased a property ("Property") in the Liberty Corner[6] section of Bernards Township—"a residential zone containing a mix of single-family homes, institutional uses, and commercial uses."[7] (Compl. ¶¶ 57, 59; Answer ¶¶ 57, 59.)  Under the applicable land use regulations, the Property does not meet the necessary requirements[8] such that a house of worship would be permitted in the residential zone as of right.  (Answer ¶ 55.)  Nonetheless, the Property is located where a house of worship constitutes a "permitted use" under the Township's zoning laws.  (Answer ¶ 5.)

Located within various residential zones in the Township, there are at least ten houses of worship:

> (a) Liberty Corner Presbyterian Church; (b) Congregation B'nai Israel (also known as Somerset Hills Jewish Center); (c) Chabad Jewish Center; (d) Millington Baptist Church; (e) Covenant Chapel Reformed Episcopal Church; (f) St. James Catholic Church; (g) St. Mark's Episcopal Church; (h) Basking Ridge Presbyterian Church; (i) Somerset Hills Lutheran Church; and (j) Somerset Hills Baptist Church.

---

[6] "ISBR purchased the Property for $750,000." (Compl. ¶ 59; Answer ¶ 59.)  "The Township [also] contains a designated historical district referred to as the Liberty Corner Historic District." (Compl. ¶ 56; Answer ¶ 56.)  "The Property is not located within the Liberty Corner Historic District." (Compl. ¶ 56; Answer ¶ 56.)

[7] In the immediate vicinity of the Property, single-family residences exist to the east and west, and a fire station is situated across the street. (Compl. ¶ 57; Answer ¶ 57.)  Additionally, a large public park, an elementary school, a gas station, an auto body shop, and a church are all located within a half-mile of the Property. (Compl. ¶ 57; Answer ¶ 57.)  Located within one mile of the Property are a yoga studio, a bakery, a doctor's office, a post office, multiple restaurants, and other retail establishments. (Compl. ¶ 57; Answer ¶ 57.)  "Some of these establishments are located inside the Liberty Corner Historic District." (Compl. ¶ 57; Answer ¶ 57.)

[8] Specifically, "the requirements of the Township's zoning ordinance or chapter 21, Article V, Development Regulations." (Answer ¶ 55.)

(Compl. ¶ 58; Answer ¶ 58.)  Similar to ISBR's Property, seven[9] of those houses of worship are located on properties abutting single-family residences.  (Compl. ¶ 58; Answer ¶ 58.)

### B.      ISBR Applies to the Board for Preliminary and Final Site Plan Approval

In anticipation of its application, ISBR shared its site plan with the nearby residents, and held two open houses to discuss its plan with the community.  (Answer ¶ 60.)  To prepare its application in compliance with the Board's requirements, ISBR solicited feedback from "the Board and certain engineering and planning staff" during a January 17, 2012 work session.  (Compl. ¶ 61; Answer ¶ 61.)  ISBR incorporated the information obtained from the work session, and decided to build a new structure to comply with certain setback requirements instead of renovating the existing structure.  (Compl. ¶ 61; Answer ¶ 61.)

On April 20, 2012, ISBR applied for preliminary and final site plan approval, proposing the construction of a 4,252 square foot mosque on the Property.  (Compl. ¶ 62; Answer ¶ 62.)  The site plan proposed a building consisting of "a 1,594-square-foot prayer hall, a *wudu* room, a multi-purpose room, an entry gallery, a kitchen, and an administrative office."  (Compl. ¶ 62; Answer ¶ 62.)  Additionally, the site plan provided for fifty parking spaces in light of the prayer hall's estimated occupancy of 150 people.[10]  (Compl. ¶¶ 62, 64; Answer ¶¶ 62, 64.)

### C.      Community Reaction to ISBR's Application

Prior to, and for the duration of ISBR's pending application, ISBR faced numerous instances of community opposition.  In or around January 2012, for example, Dr. Chaudry reported

---

[9] The referenced houses of worship include: "(a) Liberty Corner Presbyterian Church; (b) Chabad Jewish Center; (c) Millington Baptist Church; (d) Covenant Chapel Reformed Episcopal Church; (e) St. Mark's Episcopal Church; (f) Somerset Hills Lutheran Church; and (g) Somerset Hills Baptist Church."  (Compl. ¶ 58; Answer ¶ 58.)

[10] Plaintiffs allege that their site plan complied with the Township's zoning ordinances, but Defendants deny this allegation.  (*See* Compl. ¶ 62; Answer ¶ 62.)

that "an unknown individual knocked over and stomped on ISBR's mailbox."[11] (Compl. ¶ 68; Answer ¶ 68.) Additionally, in or around September 2014, Dr. Chaudry reported that an unknown individual placed stickers on ISBR's mailbox, spelling "ISIS" in reference to the violent international terrorist group.[12] (Compl. ¶ 82; Answer ¶ 82.)

Soon after ISBR submitted its application, the Board considered a proposed amendment to the Township's zoning ordinance.[13] (Compl. ¶¶ 111-13; Answer ¶¶ 111-13.) The proposed amendment "doubled the required minimum lot size from three acres to six acres and significantly increased the standards for lot coverage, floor area ratio, and building and parking setbacks."[14] (Compl. ¶ 114; Answer ¶ 114.) The proposed amendment categorized houses of worship as a "conditionally permitted use" and required that houses of worship have primary access from a state

---

[11] Defendants plead that they possess insufficient information to admit or deny the allegation except that Dr. Chaudry reported this incident to the police. (Answer ¶ 68.)

[12] Defendants plead that they possess insufficient information to admit or deny this allegation and admit only that Dr. Chaudry reported the incident and that the police report "noted [the] attempt to convert ISBR into ISIS on the mailbox." (Answer ¶ 82.)

[13] The Complaint alleges that the amendment was proposed by Lori Caratzola, who was an objector to ISBR's application to the Board. (Compl. ¶ 70.) Defendants' Answer, however, states: "[a]ll of the allegations in this paragraph are denied." (Answer ¶ 70.) The Court is not aware of any other allegations that provide background information regarding Ms. Caratzola. On September 10, 2013, certain Township Committee members formally introduced the proposed amendment. (Compl. ¶ 113; Answer ¶ 113.) Defendants' Answer to paragraph 113 does not address this allegation. (See Answer ¶ 113.); see also Fed. R. Civ. P. 8(b)(3), (6) ("A party that does not intend to deny all the allegations must either specifically deny designated allegations or generally deny all except those specifically admitted. . . . An allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied.").

[14] The Explanatory Statement of the proposed amendment explained, in part, that its purpose was to "maintain and enhance community character, protect the integrity of existing neighborhoods and prevent the intrusion of incompatible new development with existing residential development." (Compl. ¶ 113; Answer ¶ 113.) Defendants' Answer to paragraph 113 clarifies that the Explanatory Statement was not the Preamble and that the Complaint did not quote the Explanatory Statement in its entirety. (See Answer ¶ 113.)

or county road.[15] (Compl. ¶ 114; Answer ¶ 114.) On October 15, 2013, the Township adopted the proposed amendment.[16] (Compl. ¶¶ 14, 116; Answer ¶¶ 14, 116.) Although the amendment did not apply to ISBR's pending application, Plaintiffs were concerned that the amendment would apply, and ensure subsequent denials, if the Township denied their application.[17] (Compl. ¶ 121; Answer ¶ 121.) Defendants, however, assert that the amendment was not designed with discriminatory intent.[18] (Compl. ¶¶ 117, 119; Answer ¶¶ 117, 119.)

As further indication of the community's opposition, numerous objectors opposed ISBR's application at the Board hearings.[19] (Compl. ¶ 8; Answer ¶ 8.) In one instance, "a suspended lawyer with extreme views regarding Islam," was very "outspoken" in opposition to the mosque

---

[15] The proposed amendment further "imposed time limits on outdoor activities and lighting" on houses of worship. (Compl. ¶ 114; Answer ¶ 114.)

[16] Defendants' Answer does not deny that Defendants amended the local zoning law and that the amendments would make it practically impossible for Plaintiffs to build their mosque in the Township. (*See* Compl. ¶ 108; Answer ¶ 108.) In a subsequent allegation in the Complaint, Plaintiffs allege that the new amendments were harder or impossible for a house of worship to satisfy. (Compl. ¶ 108.) Defendants, however, deny the allegation. (*See* Answer ¶ 108.) The Court finds that the legal interpretation of the amendments constitutes a question of law, and therefore does not adopt either party's characterization of the original and amended ordinances.

[17] Plaintiffs assert that "the new ordinance ensured that if the Board denied ISBR's application, it could not reapply with a compliant, revised site plan." (Compl. ¶ 121.) Defendants responded: "It is denied that the new ordinance ensured that if the Board denied ISBR's application it could not reapply with a compliant revised site plan." (Answer ¶ 121.)

[18] The Complaint alleges that Defendants "assured local residents that existing houses of worship would be 'grandfathered in,'" but Defendants' Answer pleads: "Denied," with no further elaboration. (Compl. ¶ 119; Answer ¶ 119.) The Court, however, notes that paragraph fourteen of the Complaint makes the same allegation but Defendants' Answer to paragraph fourteen fails to address that allegation. (Compl. ¶ 14 ("Defendants assured [the local Christian leaders] that they would be 'grandfathered' in and that the new law would bar only new religious groups trying to gain entrance to the Township community."); Answer ¶ 14.) The Court construes the facts in the light most favorable to Defendants and therefore assumes, for the purposes of the instant Motion, that Defendants made no such communication to local houses of worship.

[19] Defendants' Answer to paragraph eight of the Complaint does not address this allegation. (*See* Answer ¶ 8); *see also* Fed. R. Civ. P. 8(b)(3), (6).

and "exhorted the community to 'continue to attend [Board] meetings and create awareness among . . . neighbors' while warning 'about the Muslim practice of "taqiyya," [which is] deceit, condoned and encouraged in the Quran.'"[20]   (Compl. ¶ 6 (first alteration in original); Answer ¶ 6.) Additionally, a community organization called the Bernards Township Citizens for Responsible Development ("BTCRD") retained private counsel to represent BTCRD in the hearings.  (Answer ¶ 100.)

**D.      Township's Consideration and Denial of ISBR's Application: Parking Issue**[21]

ISBR's hearings before the Planning Board commenced on August 7, 2012, and continued until the denial of ISBR's application on December 8, 2015—amounting to 39 hearings over a three-and-a-half year period, which is more than the Planning Board held for any previous applicant.[22]  (Compl. ¶ 65; Answer ¶¶ 65-66.)  Moreover, throughout the process, the Planning Board and its professionals made a series of demands based on the Board's interpretations of the zoning ordinance that had never been applied to any other applicant in the Township.[23]  (Compl. ¶ 8.)  In response, Plaintiffs "revised their site plan and brought back professionals to testify time and again, only to find that the Board had generated yet more requirements resulting from Plaintiffs' satisfaction of prior demands."[24]  (Id.)

---

[20] Defendants' Answer to paragraph six of the Complaint does not address this allegation.  (See Answer ¶ 6); see also Fed. R. Civ. P. 8(b)(3), (6).

[21] As the instant Motion addresses only the parking issue, the Court sets forth only the facts regarding the parking issue as it relates to the denial of ISBR's application.

[22] "The period of time from the initial Board work sessions to the issuance of a final resolution was four years."  (Compl. ¶ 65; Answer ¶ 65.)

[23] Defendants' Answer to paragraph eight of the Complaint denies that the Board and its professionals adopted the objectors' arguments but does not address this allegation.  (See Answer ¶ 8); see also Fed. R. Civ. P. 8(b)(3), (6).

[24] Defendants' Answer to paragraph eight of the Complaint denies the allegation concerning the "cost and expenses incurred by [P]laintiffs," but does not address this allegation.  (See Answer ¶ 8); see also Fed. R. Civ. P. 8(b)(3), (6).  Additionally, while ISBR's application was pending, "[a]t the Board's

10

In particular, Plaintiffs' application was subjected to unprecedented individualized inquiry into its off-street parking needs. (Compl. ¶ 127; Answer ¶ 127.) Bernards Township Ordinance § 21-22.1 ("Parking Ordinance") (Pls.' Ex. 2, ECF No. 31-2) sets forth a schedule of "acceptable" parking standards for a variety of uses.[25] (Compl. ¶ 125; Answer ¶ 125.) With regard to "[c]hurches, auditoriums, [and] theaters," the schedule provides that "[one] space for every [three] seats or [one] space for every [twenty-four] linear inches of pew space"—a 3:1 ratio—constitutes an acceptable amount of off-street parking. (Compl. ¶ 125 (second alteration in original); Answer ¶ 125.)

The word "churches" is not expressly defined in the Parking Ordinance. (Compl. ¶ 126; Answer ¶ 126.) The Parking Ordinance's operative definitions clause provides that words that are not expressly defined have the definitions set forth in Webster's Third New International Dictionary of the English Language (unabridged version) ("Webster's Dictionary"). (Compl. ¶ 126; Answer ¶ 126.) The Webster's Dictionary definition, therefore, applies. (Compl. ¶ 126; Answer ¶ 126.) Because the Webster's Dictionary defines "church" as "a place of worship of any religion ([e.g.,] a Muslim [mosque])," the Parking Ordinance's definition of "churches" includes mosques.[26] (Compl. ¶ 126; Answer ¶ 126.)

---

request," ISBR's professionals developed five sets of plans with "engineering, architectural, stormwater management, and landscaping details, and several interim and subsequent revised individual plan pages." (Compl. ¶ 122; Answer ¶ 122.) Defendants' Answer to paragraph 122 of the Complaint admits that ISBR's professionals developed five sets of plans at the Board's request, and does not deny the content of the plans as alleged by Plaintiffs, other than that the plans were not "fully developed." (Answer ¶ 122.)

[25] Defendants note that the phrase "house of worship" does not appear in the Parking Ordinance. (Answer ¶ 125.)

[26] Although the interpretation of the Webster's Dictionary definition of "church" constitutes a conclusion of law, the specific definition of "church" set forth in Webster's Dictionary is a statement of fact. The Court, therefore, assumes the parties' stipulation as to the definition of "church" as true. Based on the Court's review of this definition, the Court finds that the Parking Ordinance's reference to the word "churches" includes mosques.

Prior to ISBR's application, the Planning Board applied the Parking Ordinance's 3:1 parking ratio for "churches" to every house of worship that applied for site plan approval, including two local synagogues. (Compl. ¶ 217; Answer ¶ 127.) Additionally, prior to ISBR's application, the Planning Board accommodated requests for fewer parking spaces than required by the Parking Ordinance—i.e. it issued downward variances. (Compl. ¶ 217; Answer ¶ 127.)[27]

Given that ISBR's original site plan anticipated a maximum of 150 worshippers in its prayer hall, ISBR's application provided for fifty parking spaces—a 3:1 ratio between seats (prayer mats) and parking spaces. (Compl. ¶¶ 10, 128; Answer ¶¶ 10, 128.) As part of the review process for a development proposal, the Township Planner issues a review letter designed to inform the Board of required exceptions and variances an applicant needs from the applicable land use ordinances.[28] (Compl. ¶ 130; Answer ¶ 130.) Upon his initial assessment of ISBR's application, Township Planner David Schley did not identify any issues with ISBR's proposal for fifty parking spaces.[29] (Compl. ¶ 130; Answer ¶ 130.)

---

[27] Defendants also admit that "[t]he Board has never engaged in an individualized determination of additional parking need for any other applicant," but explain that it was "because the revised [Institute of Transportation Engineers ('ITE')] standard did not exist" before ISBR submitted its application. (Compl. ¶ 127; Answer ¶ 127.) Here, whether Defendants' application of the Parking Ordinance constitutes discrimination on the basis of religion, as opposed to a legitimate decision based on something other than religion, is the very legal question at issue. Therefore, to the extent that this allegation constitutes a legal conclusion, the Court does not assume it to be true for the purpose of the instant Motion. Moreover, the Court finds that the parties' characterization of the Board's conduct toward ISBR as unprecedented "*individualized* determination" contradicts the case-by-case downward variances granted to other applicants. (*See* Compl. ¶¶ 250, 257, 259, 274; Answer ¶¶ 250, 257, 259, 274.)

[28] Defendants' Answer to paragraph 130 of the Complaint admits the immediately preceding allegation, and fails to address any remaining allegations in the paragraph. (*See* Answer ¶ 130); *see also* Fed. R. Civ. P. 8(b)(3), (6).

[29] "In a separate letter dated August 3, 2012, Township Planner David Schley likewise noted that ISBR's proposal included [fifty] parking spaces." (Compl. ¶ 130; Answer ¶ 130.) Defendants' Answer to paragraph 130 of the Complaint admits the first allegation of the paragraph, and fails to address any remaining allegations in the paragraph. (*See* Answer ¶ 130); *see also* Fed. R. Civ. P. 8(b)(3), (6). Additionally, "Mr. Banisch[, the Board Planner, also] did not recommend any increase in the number

12

On August 7, 2012, the Board initiated public hearings on ISBR's application.  (Compl.
¶ 131; Answer ¶ 131.)  At the August 7, 2012 and September 4, 2012 hearings, Board members
and community objectors questioned the future growth rate of ISBR's congregation in determining
the mosque's expected occupancy.  (Compl. ¶ 131; Answer ¶ 131.)  In response, Dr. Chaudry
stated that ISBR currently had fifty-five members and averaged sixty-five attendees at its weekly
Friday afternoon service.  (Compl. ¶ 132; Answer ¶ 132.)  According to Dr. Chaudry, applying the
highest possible growth rate would result in a maximum of 150 attendees at the weekly service
within five to ten years.  (Compl. ¶ 132; Answer ¶ 132.)  Dr. Chaudry further assured the Board
that ISBR would comply with the occupancy limits in accordance with the Township's fire code.
(Compl. ¶ 135; Answer ¶ 135.)  Board member Richard Huckins responded, "I've read somewhere
that there's like an estimate of . . . 50[,000] to 100,000 Muslims in the State of New Jersey. . . . I
find it hard to believe that you would see such a small number to just go from fifty-five to 150."
(Compl. ¶ 133; Answer ¶ 133.)

Following these hearings, Board Planner Banisch issued a revised October 25, 2012
memorandum on the issue of parking.  (Compl. ¶ 136; Answer ¶ 136.)  There, Mr. Banisch
estimated the size of a Muslim prayer mat and calculated that 168 prayer mats could theoretically
fit into the prayer hall.[30]  (Compl. ¶ 136; Answer ¶ 136.)  The Board subsequently requested ISBR
to submit parking ratio information, and specifically included in their request a 2010 publication,
by the Institute of Transportation Engineers ("ITE"), entitled *Parking Generation*.
(Compl. ¶¶ 138, 140; Answer ¶¶ 138, 140.)  In or around December 2012, ISBR submitted the five

---

of parking spaces in his letter of August 7, 2012, though he did make such a recommendation at a later
date."  (Answer ¶ 129.)

[30] Defendants' Answer to paragraph one-hundred-thirty-six of the Complaint denies "that Mr. Banisch
ever conceded that [fifty] or [fifty-six] parking spaces were sufficient" and admits to all other
allegations in the paragraph.  (Answer ¶ 136.)

industry publications the Board requested, including the ITE *Parking Generation* report concerning parking ratios for various houses of worship. (Compl. ¶ 140; Answer ¶ 140.) The ITE *Parking Generation* report contains parking standards specific to Muslim mosques, and states:

> It should be understood that the data contained in this report are collected by volunteers and are not the result of a financed research effort. The ranges of information and statistics are provided *only* as an informational guide to planners and designers regarding parking demand. This informational report does not provide authoritative findings, recommendations, or standards on parking demand.

(Compl. ¶¶ 138, 145; Answer ¶¶ 138, 145.)

Prior to ISBR's application, the Board had never applied ITE's parking rates to any house of worship's application for site plan approval. (Answer ¶ 139.) Notably, the ITE parking rates at issue were not published until 2010 and were, therefore, unavailable when houses of worship submitted proposed site plans to the Board prior to ISBR's application. (*Id.* ¶ 139.) Based on the requested submissions,[31] the parking recommendations ranged from thirty-six to 110 spaces. (Compl. ¶ 140; Answer ¶ 140.) Of the publications, the ratio derived from the ITE *Parking Generation* report recommended the highest requirement—110 spaces. (Compl. ¶ 140; Answer ¶ 140.)

A week later, on December 21, 2012, BTCRD objectors asserted that the Parking Ordinance's 3:1 ratio for churches did not apply to ISBR's application "because a mosque is not a church." (Compl. ¶ 141; Answer ¶ 141.) BTCRD argued that the mosque-specific ratio in ITE's *Parking Generation* report required 110 spaces, which exceeded the 3:1 ratio. (Compl. ¶ 141; Answer ¶ 141.) Shortly thereafter, on January 3, 2013, Board Attorney Jonathan Drill and Board Planner Banisch issued a joint memorandum ("Drill/Banisch Memo") that set forth two legal positions:

---

[31] "ISBR then applied these parking ratios to the specifications of its plans." (Compl. ¶ 140; Answer ¶ 140.)

1) that the Parking Ordinance required the Board to engage in an individualized analysis of every applicant's parking need, regardless of the ratios set forth in the ordinance; and

2) that the Parking Ordinance's 3:1 ratio for "churches" applied only to Christian churches.

(Compl. ¶ 142; Answer ¶ 142.)

In support of the first position, the Board referenced the following language from the Parking Ordinance:

> Since a specific use may generate a parking demand different from those enumerated below, documentation and testimony shall be presented to the Board as to the anticipated parking demand. Based upon such documentation and testimony, the Board may . . . [i]n the case of nonresidential uses, require that provision be made for the construction of spaces in excess of those required hereinbelow, to ensure that the parking demand will be accommodated by off-street spaces.

(Compl. ¶ 144; Answer ¶ 144.) Based on this provision, the Drill/Banisch Memo incorporated the ITE *Parking Generation* report's rate for mosques and calculated that ISBR must provide 110 parking spaces. (Compl. ¶ 145; Answer ¶ 145.) The Drill/Banisch Memo provided that ISBR could present alternative recommendations "based on a local parking study," and that the 110 parking space requirement would be reconsidered upon submission of evidence indicating otherwise. (Compl. ¶ 145; Answer ¶ 145.)

Accordingly, the Board requested that ISBR Traffic Engineer Henry Ney ("Mr. Ney") submit additional evidence on the issue of parking. (Compl. ¶ 146; Answer ¶ 146.) In response, Mr. Ney collected data from four different mosques on six different occasions and calculated the number of parking spaces. (Compl. ¶ 146; Answer ¶ 146.) From January to June 2013, ISBR presented supplemental parking studies and testimony with regard to ISBR's estimated parking

needs.[32] (Answer ¶ 146.) On June 4, 2013, BTCRD objectors presented their own traffic engineer, Alexander Litwornia ("Mr. Litwornia"). (Answer ¶ 149.) Mr. Litwornia projected ISBR's parking demands based on the number of attendees per car and found that ISBR should provide 107 parking spaces. (Answer ¶ 149; Compl. ¶ 149.) Despite the fact that ISBR's congregation currently peaked at sixty-five worshippers for one weekly service,[33] the Board voted to require 107 parking spaces. (Compl. ¶ 10; Answer ¶¶ 10, 150.)

In response, ISBR offered to split its weekly service into two separate services, similar to certain local churches.[34] (Compl. ¶ 151; Answer ¶ 151.) Splitting the weekly service would reduce the parking demand by half and would resolve any other potential parking concerns.[35] (Compl. ¶ 151; Answer ¶ 151.) ISBR Traffic Engineer Mr. Ney further offered that ISBR could engage in other strategies implemented by local churches, such as ride-sharing arrangements, valet parking, or a nearby lot for overflow parking. (Compl. ¶ 151; Answer ¶ 151.) Ultimately, ISBR revised its site plan to provide for 107 parking spaces, although ISBR did not formally create a final site plan including this revision. (Compl. ¶ 11; Answer ¶ 11.) The Board, nevertheless, denied ISBR's application on January 19, 2016.[36] (Compl. ¶¶ 15, 123; Answer ¶¶ 15, 123.)

---

[32] The Drill/Banisch Memo recognized that "traffic engineers" recommend requiring the 85th percentile of parking data because the 100th percentile results in unnecessary parking spaces, yet the Board questioned Mr. Ney about 100th percentile figures. (Compl. ¶ 148; Answer ¶ 148.)

[33] Defendants' Answer to paragraph ten of the Complaint does not address this allegation. (*See* Answer ¶ 10); *see also* Fed. R. Civ. P. 8(b)(3), (6).

[34] Defendants' Answer to paragraph 151 of the Complaint fails to address this allegation. (*See* Answer ¶ 151); *see also* Fed. R. Civ. P. 8(b)(3), (6).

[35] Defendants' Answer to paragraph 151 of the Complaint fails to address this allegation. (*See* Answer ¶ 151); *see also* Fed. R. Civ. P. 8(b)(3), (6).

[36] "[O]n December 8, 2015, the Board voted to deny . . . [P]laintiffs' application." (Answer ¶¶ 15, 87.) "[O]n January 19, 2016, the Board issued its formal resolution of denial [of Plaintiffs' application]." (Compl. ¶¶ 15, 123; Answer ¶¶ 15, 123.)

E.       **Township's Treatment of Non-Islamic Religious Institutions**[37]

    1.       Chabad Jewish Center

In August 1995, Chabad Jewish Center ("Chabad"), which is located in a residential zone, applied for preliminary and final site plan approval to construct a forty-seat synagogue as an addition to an existing structure. (Compl. ¶ 244; Answer ¶ 244.)  The Board promptly approved Chabad's application in less than three months, after two public hearings. (Compl. ¶ 244; Answer ¶ 244.)

    Chabad's proposed site plan applied the Parking Ordinance's 3:1 ratio and provided seventeen parking spaces.[38] (Compl. ¶ 245; Answer ¶ 245.)  Chabad's site plan explicitly noted to the Board that it was applying the 3:1 ratio. (Compl. ¶ 245; Answer ¶ 245.)  Additionally, Chabad offered to provide three additional parking spaces over the required 3:1 ratio. (Compl. ¶ 245; Answer ¶ 245.)  At the Board's hearings regarding Chabad's application, no debate occurred over the required number of off-street parking spaces, and "the Board did not perform an individualized inquiry into Chabad's actual parking needs." (Compl. ¶ 245; Answer ¶ 245.)  Upon reviewing Chabad's application, the Board found Chabad's parking proposal to be "adequate." (Compl. ¶ 245; Answer ¶ 245.)

    Years later, in November 2000, Chabad applied for site plan approvals regarding the addition of a 2,581 square foot clergy residence, an 18,126 square foot building for classrooms and offices, a 6,318 square foot 200-seat sanctuary, and a 175-seat social hall. (Compl. ¶ 249; Answer ¶ 249.)  In less than six months, and after two public hearings, the Board approved Chabad's proposals. (Compl. ¶ 249; Answer ¶ 249.)

---

[37] Because the instant Motion deals only with the parking issue, the Court sets forth only the facts dealing with the parking issue for similarly situated entities.

[38] The seventeen parking spaces include: "[fourteen] spaces using the Township's 3:1 parking ratio for churches, plus three spaces for a clergy residence." (Compl. ¶ 245; Answer ¶ 245.)

When evaluating Chabad's November 2000 site plan proposals, the Board applied the Parking Ordinance's 3:1 ratio to Chabad's proposed 200-seat sanctuary, multiple classrooms, and clergy residence, and required ninety-four parking spaces. (Compl. ¶ 250; Answer ¶ 250.) In applying the 3:1 ratio, the Board did not consider the proposed 175-seat social hall because Chabad testified that certain parts of the structure would not be simultaneously used. (Compl. ¶¶ 250-51; Answer ¶¶ 250-51.) Additionally, the Board considered Chabad's agreement with a neighboring church to use its lot as an overflow parking lot. (Compl. ¶ 251; Answer ¶ 251.) The Board ultimately granted Chabad a downward variance from the Parking Ordinance's 3:1 ratio, requiring only sixty-nine spaces if Chabad provided for an off-duty police officer to regulate traffic. (Compl. ¶ 251; Answer ¶ 251.)

> 2.   Congregation B'nai Israel

In or around November 1993, Congregation B'nai Israel ("B'nai Israel"), which is located in a residential zone, applied for preliminary and final site plan approval, proposing a 25,808 square foot complex consisting of a synagogue, religious school, and nursery school. (Compl. ¶ 257; Answer ¶ 257.) Within less than five months, the Board granted both preliminary and final site approval after two public hearings. (Compl. ¶ 257; Answer ¶ 257.)

Upon reviewing B'nai Israel's site plan, which proposed 745 seats,[39] the Board calculated that the Parking Ordinance required 138 parking spaces, which amounts to less than a 3:1 ratio. (Compl. ¶ 258; Answer ¶ 258.) B'nai Israel, in turn, requested a downward variance and proposed providing eighty parking spaces: fifty-seven paved and twenty-three gravel. (Compl. ¶ 258; Answer ¶ 258.) In support, B'nai Israel also offered to implement valet parking if attendance reached "peak capacity." (Compl. ¶ 258; Answer ¶ 258.)

---

[39] Defendants' Answer to paragraph 258 of the Complaint denies that the proposed facility contained at least 750 seats, and instead alleges that it contained 745 seats. (*See* Answer ¶ 258.)

The Board granted B'nai Israel's proposal for eighty parking spaces because "the proposed parking areas [are] constrained by the locations of the proposed septic field and of the wetlands area on the Property," such that "strict enforcement of the requirement regarding the number of parking spaces to be provided would be impracticable or would exact undue hardship." (Compl. ¶ 259; Answer ¶ 259.)  Upon granting B'nai Israel's application, the Board recommended that B'nai Israel provide for a grass-covered overflow parking lawn. (Compl. ¶ 259; Answer ¶ 259.)

### 3. Millington Baptist Church

In or around 1998, Millington Baptist Church ("Millington"), which is located in a residential zone, applied for preliminary site plan approval proposing construction of a 67,390 square foot church with 1,200 seats, twenty-one Sunday School classrooms, and 403 parking spaces. (Compl. ¶ 269; Answer ¶ 269.)  In October 2000,[40] the Board approved Millington's application. (Compl. ¶ 269; Answer ¶ 269.)

In considering Millington's application, the Board applied the Parking Ordinance's 3:1 ratio for "churches." (Compl. ¶ 270; Answer ¶ 270.)  "The Board did not perform an individualized analysis of Millington's actual parking need." (Compl. ¶ 270; Answer ¶ 270.)  The Board, therefore, "treated Millington differently and better than ISBR in that the Board calculated parking for a house of worship using the 3:1 parking ratio set forth in the [Parking] [O]rdinance."[41] (Compl. ¶ 270; Answer ¶ 270.)

---

[40] Defendants' Answer to paragraph 269 of the Complaint states that "the original Resolution was passed September 7, 1999 and [the] amended/corrected Resolution was passed October 3, 2000." (Answer ¶ 269.)

[41] Defendants' Answer states: "All of the allegations in this paragraph are admitted."  To the extent that these allegations constitute legal conclusions under Plaintiffs' RLUIPA claim, the Court does not assume these allegations as true.

Years later, in or around 2007, Millington applied for preliminary and final site plan approval, as well as variance relief from the parking requirement, for the construction of a youth and family ministry building as an addition to the existing structures. (Compl. ¶¶ 273-74; Answer ¶¶ 273-74.) In May 2008, the Board approved Millington's application after four public hearings. (Compl. ¶ 273; Answer ¶ 273.)

In reviewing Millington's 2007 application, the Board noted that Millington's proposal for 157 parking spaces fell short of the 384 parking spaces required by the Parking Ordinance. (Compl. ¶ 274; Answer ¶ 274.)[42]  Even Millington admitted that its proposed on-site parking was inadequate during Sunday mornings. (Compl. ¶ 274; Answer ¶ 274.) Millington nevertheless requested a downward variance from the Parking Ordinance's 3:1 ratio, proposing to supplement its existing parking spaces by using a nearby shopping center's lot or a shuttle service. (Compl. ¶ 274; Answer ¶ 274.) The Board granted Millington's proposal for 157 parking spaces but required that Millington provide seventy-five off-site parking spaces along with a shuttle service. (Compl. ¶ 274; Answer ¶ 274.)

## III.   **Legal Standard**

Under Federal Rule of Civil Procedure 12(c), "judgment will not be granted unless the movant clearly establishes that no material issue of fact remains to be resolved and that [the movant] is entitled to judgment as a matter of law." *Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir. 2008) (quoting *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290-91 (3d Cir. 1988)). "[The Court] must view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Id.* (quoting *Jablonski*, 863 F.2d at 290-91). "The assumption of truth does not apply, however, to legal conclusions couched as

---

[42] "The Zoning Board characterized the proposed 157 spaces as 'significantly fewer than the number of spaces required by Ordinance.'" (Compl. ¶ 274; Answer ¶ 274.)

factual allegations . . . ." *Bethea v. Roizman*, No. 11-254, 2012 WL 4490759, at *5 (D.N.J. Sept. 27, 2012).[43]

Specifically, where a plaintiff brings the motion for judgment on the pleadings, "the question for determination is whether on the undenied facts alleged in the complaint and assuming as true all the material allegations of fact in the answer, the plaintiff is entitled to judgment as a matter of law." *United States v. Blumenthal*, 315 F.2d 351, 352 (3d Cir. 1963). In other words, "the question is whether the facts alleged in the answer are material in the sense that, if proved, they will constitute a legal defense to the plaintiff's claim." *Id.* at 352-53.

## IV.  **Parties' Positions**

### A.  **Count Three: Discrimination on the Basis of Religion under RLUIPA**

Plaintiffs argue that the Planning Board discriminated against ISBR because, "[b]ut for ISBR's faith, it would not have been required to incorporate plans for a parking lot [that is] more than twice the size of what would be 'acceptable' for a church or synagogue." (Pls.' Moving Br. 13, ECF No. 30.) Plaintiffs assert that Defendants, therefore, have admitted in their pleadings a violation of RLUIPA's prohibition against religious discrimination. (*Id.*)

Under RLUIPA's Nondiscrimination Provision, Plaintiffs argue that "[i]nvidious motive is not a necessary element," but rather "[a]ll you need is that the state actor *meant* to single out a plaintiff because of the *protected characteristic* itself." (*Id.* at 15 (quoting *Hassan v. City of New York*, 804 F.3d 277, 297 (3d Cir. 2015)).) In applying this standard, Plaintiffs argue that it is sufficient to show that Defendants would not have applied the "different" parking standards to ISBR's application if Plaintiffs were not Muslim. (*Id.*)

---

[43] Accordingly, the Court only considers factual allegations set forth by Defendants' Answer, or facts to which Defendants have admitted in their Answer, either in express terms or by Defendants' failure to respond. The Court further construes all facts in the light most favorable to Defendants and does not adopt the parties' admissions to conclusions of law.

Plaintiffs assert that the Parking Ordinance lays out a clear 3:1 ratio for houses of worship applying for site approval. (*Id.* at 17.) Plaintiffs further argue that Defendants admit to applying the 3:1 ratio to every house of worship since the Parking Ordinance was first adopted. (*Id.*) In contrast, Plaintiffs assert that Defendants admit that the 3:1 ratio was not applicable to "mosques," and instead only applied to "churches, auditoriums and theaters." (*Id.*) According to Plaintiffs, Defendants have admitted that they "subjected ISBR to an 'individualized determination' based on an erroneous interpretation that had never been applied to any other applicant, only because the proposed establishment was not a [Christian] church, but a mosque." (*Id.*)

In anticipation of Defendants' reliance on the ITE *Parking Generation* report, Plaintiffs argue that Defendants only applied the ITE parking standards because ITE "explicitly distinguished among mosques, synagogues, and churches as to parking requirements." (*Id.*) Plaintiffs argue that the ITE *Parking Generation* report was the only known source that made the distinctions and that ITE's report does not provide governments with "a free pass to discriminate on the basis of religion." (*Id.* at 18.)

Plaintiffs further argue that Defendants had never "engage[d] in individualized determinations of parking need for any prior applicants." (*Id.*) "Rather, the Planning Board applied the Parking Ordinance's 3:1 ratio to a church (Millington) and two synagogues (B'nai Israel and Chabad), but not to ISBR." (*Id.*) Plaintiffs additionally argue that Defendants "admit that the Planning Board historically applied the 3:1 ratio to synagogues[,] despite [their] position with respect to ISBR's application that the word 'church' in the [Parking] [O]rdinance refers only to Christian churches." (*Id.*)

In opposition, Defendants argue that RLUIPA requires Plaintiffs to identify "similarly situated comparators" to determine whether discrimination occurred under RLUIPA's

Nondiscrimination Provision, as well as the Equal Terms Provision[44]—a separate provision of RLUIPA that prohibits disparate treatment between religious and secular institutions. (Defs.' Opp'n Br. 19, ECF No. 46.) Defendants further assert that the Equal Terms Provision of RLUIPA does not require a substantial burden or strict scrutiny analysis, and instead requires that a plaintiff show disparate treatment from a similarly situated nonreligious person or entity. (*Id.* at 20.)

In applying this standard, Defendants argue that they have not admitted to disparate application of the 3:1 parking ratio. (*Id.* at 22.) Defendants also argue that ISBR's application was the first instance in which they applied the ITE parking standards because the revised 2010 standards did not exist until ISBR's application. (*Id.*) Defendants further argue that Plaintiffs have not established that Defendants applied a "novel, individualized parking requirement" to ISBR's application because Plaintiffs have not offered any evidence that Defendants failed to consider other applicants' individual parking needs. (*Id.* at 23.)

Moreover, Defendants argue that the Parking Ordinance "recognizes that a specific use may generate a parking demand different from the schedule[,] thus requir[ing] testimony and documentation as to the anticipated parking demand." (*Id.* at 26.) Because the purpose of the Parking Ordinance is "to accurately assess the parking demand as to each specific use," Defendants assert that an evenhanded application of the Parking Ordinance would nevertheless result in different ratios depending on the specific application. (*Id.* at 27.) Specifically, Defendants argue that Plaintiffs have failed to identify similarly situated comparators because the comparator-applications identified by Plaintiffs pre-date ISBR's 2012 application and the 2010 ITE *Parking Generation* report. (*Id.* at 26.) Defendants additionally argue that the 3:1 ratio is specifically applicable to "churches," which have different traffic patterns than mosques or synagogues. (*Id.*)

---

[44] The Equal Terms Provision is codified at 42 U.S.C. § 2000cc(b)(1). Given that Plaintiffs' Motion does not implicate the "Equal Terms" provision of RLUIPA, which Plaintiffs plead under Count Two, the Court construes the relevant portions of Defendants' arguments as relating to Count Three.

Further, Defendants argue that requiring 107 spaces would permit ISBR's mosque to grow, because accepting ISBR's proposal of fifty or fifty-six spaces would limit additional people from attending worship service.  (*Id.* at 29.)   According to Defendants, Plaintiffs testified that congregants could find off-site parking but were unable to identify a specific location.  (*Id.*)

Specifically, as to RLUIPA's Nondiscrimination Provision, Defendants argue that Plaintiffs must establish discriminatory intent. (*Id.* at 21.) Further, Defendants argue that Plaintiffs mischaracterize RLUIPA's Nondiscrimination Provision as "switching the burden of proof to the government after the plaintiff makes out a prima facie case." (*Id.* at 22.)

In applying the Nondiscrimination Provision, Defendants argue that Plaintiffs have failed to proffer direct or circumstantial evidence of discrimination or intent to discriminate based on religion. (*Id.* at 23.) Defendants assert that the pleadings show that "the Board treated all of the houses of worship the same in accordance with the standards in effect at the time." (*Id.*) According to Defendants, the ITE parking standards are authoritative and were updated in 2010 "to allow greater accuracy in determining parking requirements, and would be applied to any mosque, church or synagogue after that date." (*Id.*)

Defendants also argue that all applicants are "required to present evidence of anticipated parking demand." (*Id.* at 24.) Specifically, with regard to ISBR's application, Defendants state that they took testimony from ISBR Traffic Engineer Mr. Ney, who recommended "that the number of occupants should be divided by a factor of 1.35" to determine the parking need. (*Id.* at 25.) Moreover, Defendants note that the objector BTCRD's expert traffic engineer, Mr. Litwornia, recommended "that the number of occupants should be divided by a factor of 1.4." (*Id.*)

According to Defendants, "the Board gave more weight to Mr. Litwo[rn]ia's opinion due to 'the strengths and weaknesses of [Mr. Ney and Mr. Litwornia's] analyses' and decided that the required number of parking spaces was 107." (*Id.*) Defendants assert that "[i]t is the Board's

prerogative to credit or discredit the expert opinions." (*Id.*) Defendants further argue that "[a]t all times the applicant bears the burden of proof on its application, and if the burden is not sustained[,] the [B]oard has no choice but to deny the application." (*Id.*)

Next, in response to Plaintiffs' reliance on *Hassan* to argue the relevant standard for discriminatory intent, Defendants argue that *Hassan* is irrelevant because it did not involve the application of zoning ordinances. (Defs.' Opp'n Br. 27 (citing *Hassan*, 804 F.3d at 297).) In further response to *Hassan*, Defendants argue that even if Plaintiffs were not required to establish discriminatory intent, Plaintiffs have failed to establish disparate treatment. (*Id.* at 28.) Defendants also distinguish Plaintiffs' reliance on *Fowler v. Rhode Island*, by asserting that, unlike the government in *Fowler*, Defendants did not concede that they disparately treated ISBR. (Defs.' Opp'n Br. 27 (citing *Fowler*, 345 U.S. 67, 69 (1953)).)

In reply, Plaintiffs argue that Defendants admit that the 3:1 ratio should apply to mosques, when in fact the Planning Board refused to consider mosques as "churches" under the Parking Ordinance. (Pls.' Reply Br. 3, ECF No. 51.) Plaintiffs further argue that Defendants fail to dispute that they adopted a "mosque-specific methodology," which Defendants justify by relying on the ITE *Parking Generation* report. (*Id.* at 4.) According to Plaintiffs, Defendants admit that the *Parking Generation* report acknowledges that it is not authoritative and is merely an "informational guide." (*Id.*) Contrary to Defendants' arguments, Plaintiffs assert that New Jersey law does not view the ITE *Parking Generation* report as authoritative and that ISBR traffic engineer Mr. Ney only included the ITE-based calculations in his work at the Planning Board's direction. (*Id.*)

In response to Defendants' efforts to distinguish *Hassan*, Plaintiffs argue that *Hassan* supports the proposition that invidious purpose is not required to support a RLUIPA violation. (*Id.*

25

at 5.)  Plaintiffs argue that the instant matter, like *Hassan*, involves governmental policy decisions that are based on Plaintiffs' religious affiliation.  (*Id.*)

Finally, with regard to Defendants' argument that Plaintiffs have failed to identify sufficient comparators, Plaintiffs argue that RLUIPA's Nondiscrimination Provision does not require comparators.  (*Id.* at 6.)  According to Plaintiffs, the Third Circuit only requires comparators under RLUIPA's Equal Terms Provision, and not the Nondiscrimination Provision. (*Id.* at 6-7.)  Plaintiffs further assert that even if comparators were required, Chabad, B'nai Israel, and Millington are sufficient comparators.  (*Id.* at 7-9.)

**B.     Counts Eight and Ten: Unconstitutional Vagueness under the United States and New Jersey Constitutions**

With regard to Counts Eight and Ten, Plaintiffs argue that certain provisions of the Parking Ordinance are unconstitutionally vague under the United States and New Jersey Constitutions. Specifically, Plaintiffs argue that the provisions in the Parking Ordinance permitting the Board to discretionarily raise parking requirements in excess of the 3:1 ratio affords the Planning Board unbridled discretion.  (Pls.' Moving Br. 19.)

In support of their argument, Plaintiffs rely on *Cunney v. Board of Trustees of Village of Grand View, N.Y.*, 660 F.3d 612 (2d Cir. 2011), and *Bykofsky v. Borough of Middletown*, 401 F. Supp. 1242 (M.D. Pa. 1975), as examples where similarly vague ordinances were found unconstitutional.  (Pls.' Moving Br. 19-22.)  Based on the case law, Plaintiffs argue that the challenged portions of the Parking Ordinance fail to contain any objective criteria to prevent discriminatory or arbitrary enforcement.  (*Id.*)  Plaintiffs also rely on *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494-95, 499 (1982), for the proposition that the vagueness test is more rigorous where the challenged ordinance threatens constitutionally protected rights.  (Pls.' Moving Br. 22-23.)  Additionally, Plaintiffs argue that the New Jersey Constitution similarly prohibits unbridled discretion and requires workable guidelines and criteria

26

to prevent arbitrary decision-making. (*Id.* at 23-26.) Plaintiffs finally assert that, upon a finding of unconstitutional vagueness, the Court should excise the challenged provisions and leave the remainder of the Parking Ordinance intact. (*Id.* at 26.)

In opposition, Defendants argue that the Parking Ordinance provides sufficient guidelines under the United States and New Jersey Constitutions. (Defs.' Opp'n Br. 31-40.) In support, Defendants state that the Parking Ordinance contains a "clear" objective: to "provide for parking demand by requiring off-street parking except as noted for residential development." (*Id.* (quoting Bernards Twp. Ord. § 21-22.1).) Defendants additionally cite to the Parking Ordinance's schedule of acceptable parking standards, which Defendants argue provides a 3:1 ratio for churches "but not mosques." (*Id.* at 33, 36, 38.) Further, Defendants contend that the more stringent vagueness test under *Hoffman Estates* does not apply because *Hoffman Estates* did not involve parking. (*Id.* at 37-38.)

Next, Defendants argue that an ordinance need not provide for all conceivable applications, "such as mosques," and that the Parking Ordinance's provision for accepting case-specific evidence from applicants constitutes a sufficient standard for unspecified uses. (*Id.* at 33-34.) Defendants also argue that the Parking Ordinance requires the Board to base its decision on applicants' case-specific evidence, thereby further limiting the Board's discretion. (*Id.* at 34-36.)

Defendants proceed to distinguish Plaintiffs' reliance on *Cunney* by arguing that the Second Circuit case did not involve parking needs. (*Id.* at 34-35.) Defendants further state that the ordinance in *Cunney* did not contain the necessary specifications, whereas the Parking Ordinance provides sufficient guidelines. (*Id.* at 35.) Defendants, however, do not elaborate on this point. (*Id.*) Defendants similarly argue that *Bykofsky* is inapplicable because it involved a penal ordinance and because it upheld portions of the ordinance as necessarily flexible. (*Id.* at 37.) Defendants additionally argue that the Parking Ordinance provides the Board with necessary

flexibility and provides applicants adequate notice of what constitutes sufficient off-street parking. (*Id.* at 35.) For these propositions, Defendants cite the Parking Ordinance's procedure for permitting applicants to submit documentation and testimony. (*Id.* at 35-36.)

In reply, Plaintiffs assert that Defendants have failed to cite any precedent for permitting unbridled discretion in determining parking requirements. (Pls.' Reply Br. 11.) Finally, Plaintiffs respond that Defendants' reliance on the procedure for submitting applicants' evidence does not constitute a standard by which the Board must objectively determine off-street parking needs. (*Id.* at 11-12.)

## V.    Amicus Curiae[45]

### A.    First Amicus Brief[46]

The First Amicus Brief is submitted by "religious, legal, and civil liberties organizations concerned that [RLUIPA] be accurately interpreted and that constitutional rights be fully enforced." (First Amicus Br. 1, ECF No. 75.) The First Amicus Brief discusses RLUIPA's legislative history and relevant case law to argue that Congress's objective was to redress the very behavior giving rise to the instant matter. (*See, e.g.*, *id.* at 4.) According to the First Amicus Brief, litigation trends "demonstrate that the number of RLUIPA cases involving mosques is disproportionate to the percentage of Muslims in the U.S. population." (*Id.*) On the merits, the

---

[45] On December 12, 2016, the Court granted leave for two amici to file briefs in support of Plaintiffs' Motion. (ECF No. 74.)

[46] The first amicus curiae submission ("First Amicus Brief") was filed by: the American Association of Jewish Lawyers and Jurists, Baptist Joint Committee for Religious Liberty, Becket Fund for Religious Liberty, Center for Islam and Religious Freedom, Ethics and Religious Liberty Commission of the Southern Baptist Convention, Interfaith Coalition on Mosques, International Mission Board of the Southern Baptist Convention, International Society for Krishna Consciousness, Muslim Bar Association of New York, National Asian Pacific American Bar Association, National Association of Evangelicals, New Jersey Muslim Lawyers Association, Queens Federation of Churches, Sikh American Legal Defense and Education Fund, Sikh Coalition, South Asian American Bar Association of New Jersey, South Asian Bar Association of New York, and Unitarian Universalist Legislative Ministry of New Jersey. (ECF No. 75.)

First Amicus Brief supports Plaintiffs' arguments that Defendants violated RLUIPA's Nondiscrimination Provision and that the Parking Ordinance is unconstitutionally vague. (*Id.* at 5-15.)

### B.    Second Amicus Brief[47]

The Second Amicus Brief consists of civil liberties and civil advocacy groups "that work to serve members of religious communities and bridge interfaith understanding." (Second Amicus Br. 1, ECF No. 76.)  The Second Amicus Brief argues that Defendants' treatment of ISBR is indicative of a growing level of national and local anti-Muslim animus. (*Id.* at 3-5.)  Additionally, the Second Amicus Brief describes multiple instances of alleged hate crimes directed toward Islamic houses of worship, and argues that "ISBR was a target of anti-Muslim hate crimes." (*Id.* at 5-7.)

The Second Amicus Brief also cites cases involving alleged overt acts of zoning-related anti-Muslim animus and examples of "pretextual zoning arguments," as evidence that "anti-Muslim RLUIPA cases continue[] to rise at an alarming rate." (*Id.* at 7-11.)  Finally, the Second Amicus Brief asserts that "[r]eligious land-use matters are particularly relevant in New Jersey" because it is "the most densely populated state in the country, as well as one of the most racially, ethnically, and religiously diverse states." (*Id.* at 12.)  In support, the Second Amicus Brief points toward other instances of alleged anti-Muslim animus based on discriminatory zoning practices in New Jersey. (*Id.* at 12-13.)

---

[47] The second amicus curiae submission ("Second Amicus Brief") was filed by: Muslim Advocates, American Civil Liberties Union, ACLU of New Jersey, Asian Americans Advancing Justice, ColorOfChange, Asian American Legal Defense & Education Fund, Arab American Institute, Interfaith Center of New York, T'ruah: The Rabbinic Call for Human Rights, National Religious Campaign Against Torture, South Asian Americans Leading Together, American-Arab Anti-Discrimination Committee, Islamic Society of New Jersey, Center for New Community, National Council of Jewish Women, Union for Reform Judaism, Central Conference of American Rabbis, Women for Reform Judaism, and The National Sikh Campaign. (ECF No. 76.)

## VI.   **Discussion**

### A.     **Count Three: Discrimination on the Basis of Religion under RLUIPA**

Congress passed RLUIPA upon finding that local zoning boards would use "vague and universally applicable reasons," such as traffic or aesthetics, to contrive widespread discrimination on the basis of religion.[48] *See* 146 Cong. Rec. S7,774-01, (daily ed. July 27, 2000) (joint statement of Sens. Hatch & Kennedy), 2000 WL 1079346, at *S7774. RLUIPA's first section ("Substantial Burdens Provision") prohibits land use regulations that substantially burden the exercise of religion unless the government action can survive a strict scrutiny analysis. 42 U.S.C. § 2000cc(a)(1)-(2); *see also Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 269 (3d Cir. 2007) ("[T]he Substantial Burden[s] section includes a strict scrutiny provision."). The second section of RLUIPA prohibits discrimination and impermissible exclusion on the basis of religion by prohibiting three distinct types of regulations: (1) land use regulations that treat a "religious assembly or institution on less than equal terms with a nonreligious assembly or institution" ("Equal Terms Provision"); (2) land use regulations that "discriminate[] against any assembly or institution on the basis of religion or religious denomination" ("Nondiscrimination Provision"); and (3) land use regulations that "totally exclude[] religious assemblies from a jurisdiction," or "unreasonably limit[] religious assemblies, institutions, or structures within a jurisdiction" ("Exclusions and Limits Provision"). 42 U.S.C. § 2000cc(b)(1)-(3). Plaintiffs' instant Motion, as to Count Three, arises under the Nondiscrimination Provision.

Whereas the Substantial Burdens Provision "is directly responsive to the difficulty of proof" where zoning boards engage in individualized assessments, the Equal Terms and

---

[48] When applying RLUIPA, Congress intended courts "to accord religious exercise heightened protection from government-imposed burden, consistent with [Supreme Court] precedent." *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 261 (3d Cir. 2007) (alteration in original) (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 714 (2005)).

Nondiscrimination Provisions "enforce the Free Exercise Clause . . . against [land use regulations][49] that burden religion and are not neutral and generally applicable." 146 Cong. Rec. S7,774-01, 2000 WL 1079346, at *S7775; *see also Lighthouse Inst.*, 510 F.3d at 264 (quoting 146 Cong. Rec. S7,774-01, 2000 WL 1079346, at *S7774). RLUIPA defines "[l]and use regulation" as "a zoning or landmarking law, *or the application of such a law*, that limits or restricts a claimant's use or development of land." 42 U.S.C. § 2000cc-5(5) (emphasis added). At issue in Plaintiffs' Motion under the Nondiscrimination Provision, therefore, is whether the Parking Ordinance and Defendants' *application* of the Parking Ordinance are neutral and generally applicable with regard to religion.

When applying RLUIPA, courts "shall . . . construe[] [the statute] in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of [the statute] and the Constitution." 42 U.S.C. § 2000cc-3(g). Additionally, "[i]f a plaintiff produces prima facie evidence to support a claim alleging a violation of . . . [RLUIPA],[50] the government shall bear the burden of persuasion on any element of the claim."[51] 42 U.S.C. § 2000cc-2(b).

---

[49] Although the quoted section from the legislative history uses the term "laws," the Nondiscrimination Provision in RLUIPA uses the term "land use regulation." *See* 146 Cong. Rec. S7,774-01, 2000 WL 1079346, at *S7775; 42 U.S.C. § 2000cc(b)(2).

[50] The Court inserts "RLUIPA" as an alteration to the original text, which reads: "section 2000cc of this title." 42 U.S.C. § 2000cc-2(b). Defendants argue that the burden-shifting framework does not apply because it is not specifically contained within the Nondiscrimination Provision, which is codified at 42 U.S.C. § 2000cc(b)(2). (*See* Defs.' Opp'n Br. 22.) Given that RLUIPA expressly states that the burden-shifting framework applies to a violation of section 2000cc of title 42, Defendants are incorrect, and the Court finds that the framework clearly applies to the Nondiscrimination Provision.

[51] The quoted provision also includes an exception that "the plaintiff shall bear the burden of persuasion on whether the law (including a regulation) or government practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion." 42 U.S.C. § 2000cc-2(b). Given that Plaintiffs' Motion for Partial Judgment on the Pleadings does not implicate a "substantial burden" analysis, the Court does not apply this exception.

The Court first examines the text of the Parking Ordinance under RLUIPA. In pertinent part, the Parking Ordinance sets forth a schedule containing "[parking] standards acceptable to the Township." Bernards Twp. Ord. § 21-22.1a1. The schedule specifically sets forth a 3:1 ratio, between seats and parking spaces, for "[c]hurches, auditoriums, [and] theaters." Bernards Twp. Ord. § 21-22.1. The Purpose Section of the Township Ordinance provides: "[a]ny word or term not defined herein shall be used with a meaning as defined in Webster's Third New International Dictionary of the English Language, unabridged (or latest edition)." Bernards Twp. Ord. § 21-2. The Bernards Township Ordinance does not define the term "church." (Compl. ¶ 126; Answer ¶ 126.) According to Webster's Dictionary, "church" is defined as "a place of worship of any religion ([e.g.,] a Muslim [mosque])." (Compl. ¶ 126; Answer ¶ 126.)

Based on the applicable definition of "church," the Court finds that the Parking Ordinance's 3:1 ratio for "churches" applies to mosques.[52] Moreover, because the term "churches" applies to places of worship for *any* religion, the Court finds that the Parking Ordinance is neutral and generally applicable with regard to religion.[53]

In their Answer, Defendants insist, without explanation, that the Parking Ordinance's use of the term "churches" does not include mosques. (*See* Compl. ¶ 142; Answer ¶ 142.) When the Court specifically asked counsel for Defendants at oral argument whether the Parking Ordinance's 3:1 ratio for "churches" applies to mosques, counsel responded:

---

[52] The term "'churches' include[s] houses of worship for all religions, including mosques.'" (Compl. ¶ 126; Answer ¶ 126.)

[53] The Court only considers the constitutionality of the Parking Ordinance's plain text within the scope of arguments raised by the parties with regard to the instant Motion. The Court's decision is based on Defendants' *application* of the Parking Ordinance, in the context of the instant Motion for Judgment on the Pleadings, considering the facts admitted by Defendants in the light most favorable to Defendants. Accordingly, the Court's categorization of the Parking Ordinance as constitutional on its face should not be construed as declaring that no other constitutional implications could potentially exist.

> [Defendants] admit what the statute says.   We don't admit that
> mosques are considered churches for the purposes of the statute.  For
> instance, one of the other parts of the ordinance, 21-10.4(a)(1)(c),
> [which is now codified at Section 21-10.4a3(g),] refers to houses of
> worship as opposed to just churches or mosques or specifically
> denominating any other type of religious institution.   Again, it
> makes no sense.

(Oral Arg. Tr. 34:6-12, Dec. 20, 2016.)  In response to the Court's question,[54] Defendants referred

to a different section of the Bernards Township Ordinance that defines various zones subject to

the Township's regulation—Section 21-10.4a3(g).  Section 21-10.4a3(g) states that "[h]ouses of

worship and/or houses of worship with clergyman's residence on the same premises in accordance

with Section 21-12" constitute "[c]onditional [u]ses" in certain residential zones.  Bernards Twp.

Ord. § 21-10.4a3(g).

Upon reviewing Section 21-10.4a3(g), the Court finds that Defendants' reference to the

term "house of worship" is not pertinent to the Parking Ordinance's definition of "churches."[55]

Unlike "churches," and contrary to Defendants' argument, the Township Ordinance expressly

defines "house of worship" as: "a special purpose building that is architecturally designed and

particularly adapted for the primary use of conducting on a regular basis formal religious services

by a religious congregation."  Bernards Twp. Ord. § 21-3.1.  Moreover, even if the Court were to

assume a relationship between the two terms, the term "house of worship" does not suggest the

exclusion of mosques from its definition.  Defendants' argument, therefore, further supports the

inclusion of mosques in the Parking Ordinance's definition of "churches."

---

[54] The Court asked: "Have you admitted in your pleadings that, unless it's a defined term that you, in essence, defer to the dictionary definition of church and that it would include mosque?"  (Oral Arg. Tr. 34:2-5.)

[55] In considering Defendants' argument during oral argument, the Court acknowledges that, under Rule 12(c) of the Federal Rules of Civil Procedure, the Court's decision must be based on the pleadings as to factual allegations.  The Court notes that construction of the Parking Ordinance constitutes a conclusion of law.

Upon reviewing the relevant provisions, the Court finds that the Parking Ordinance's 3:1 ratio applies to churches, synagogues, and mosques. Accordingly, the Parking Ordinance is neutral and generally applicable, and does not give rise to a facial violation of RLUIPA's Nondiscrimination Provision.

The Court next examines Defendants' *application* of the Parking Ordinance. Here, it is undisputed that Defendants interpreted the term "churches" to exclude mosques. According to Defendants' interpretation, the Parking Ordinance makes a clear distinction between Christian churches and Muslim mosques.[56] The remaining issue, therefore, is whether this distinction constitutes discrimination on the basis of religion.

In setting forth their arguments, the parties disagree on four core issues: (1) the applicable standard of intent; (2) whether RLUIPA's Nondiscrimination Provision requires Plaintiffs to establish similarly situated comparators; (3) whether Plaintiffs' proffered comparators are similarly situated to Plaintiffs; and (4) whether Defendants' disparate treatment of Christian churches, Jewish synagogues, and Muslim mosques is based on religion, as opposed to some other legitimately distinguishing characteristic. The Court addresses each in turn.

### 1.    The Applicable Standard of Intent

Plaintiffs argue that Defendants' intent to apply the 3:1 ratio differently on the basis of religion is sufficient, regardless of whether Defendants possessed animosity toward a particular religious group. (Pls.' Moving Br. 15 (citing *Hassan*, 804 F.3d at 297-98).) Defendants argue that Plaintiffs fail to offer evidence of requisite intent, but Defendants do not further elaborate and do

---

[56] Defendants fail to explain why they applied the 3:1 ratio to Jewish synagogue site plan applications. (*See* Compl. ¶ 250; Answer ¶ 250 ("In other words, the Board applied the Township's 3:1 parking ratio for churches to the number of seats in the sanctuary [to Chabad].").) Regardless of whether the Township interprets "churches" to include or exclude Jewish places of worship, however, the Township's *application* of the 3:1 ratio, as expressly excluding Muslim mosques, gives rise to the same analysis under RLUIPA's Nondiscrimination Provision.

not directly confront Plaintiffs' reliance on *Hassan*.[57]  (*See, e.g.*, Defs.' Opp'n Br. 1, 3, 4, 12, 28.) In one instance, Defendants argue that Plaintiffs fail to offer sufficient evidence to satisfy the elements set forth in *Chabad Lubavitch of Litchfield Cty., Inc. v. Litchfield Historic District Commission*, where the Second Circuit considered discriminatory intent without requiring comparators.[58]  (Defs.' Opp'n Br. 21 (citing *Chabad*, 768 F.3d 183, 198-200 (2d Cir. 2014).)  Here, the Court agrees with Plaintiffs' analysis of *Hassan* in support of their proposition and finds that Defendants have admitted to the requisite intent.  As set forth below in greater detail, the Third Circuit has not adopted the analysis outlined in *Chabad*.[59]

Moreover, neither RLUIPA nor Third Circuit jurisprudence indicates a more rigorous intent requirement.  As confirmed in their pleadings, Defendants' decision to exclude mosques from the Parking Ordinance's 3:1 ratio for "churches" was intentional.  (*See* Compl. ¶ 142; Answer ¶ 142; Defs.' Opp'n Br. 26, 33; Oral Arg. Tr. 34:7-12.)  Plaintiffs have accordingly satisfied the intent requirement and need not prove that Defendants harbored hostility toward Muslims under RLUIPA's Nondiscrimination Provision.

> ## 2. Whether RLUIPA's Nondiscrimination Provision Requires Similarly Situated Comparators

Generally, the Third Circuit requires similarly situated comparators under RLUIPA's Nondiscrimination Provision.  Where a government expressly discriminates on the basis of religion, however, the Nondiscrimination Provision does not require a showing of similarly

---

[57] Defendants merely state: "Plaintiffs argue that proof of an invidious motive is not necessary, citing *Hassan* . . . . However, even if, *arguendo*, the 'motive' equation is removed from the analysis, Plaintiffs have not shown an intent to discriminate, or that the Board desired a result whereby a mosque would be treated unequally because it is a mosque."  (Defs.' Opp'n Br. 28.)

[58] The Court further notes that Defendants' support for adopting *Chabad*'s intent requirement contradicts Defendants' prior argument—that the Court disregard *Chabad*'s finding that comparators are not required.

[59] The parties do not cite to, and the Court is unaware of, any authority indicating that the Third Circuit has adopted the Second Circuit's interpretation of RLUIPA.

situated comparators.  The instant case presents an example of express discrimination, thus precluding the need to identify specific comparators.

The Third Circuit's seminal case on RLUIPA's Equal Terms and Nondiscrimination Provisions is *Lighthouse Institute for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253 (3d Cir. 2007).  *Lighthouse Institute* arose under the Equal Terms Provision, and there, the Third Circuit established that both Provisions are subject to similar standards.  *See, e.g., id.* at 263 (determining that neither the Equal Terms Provision nor the Nondiscrimination Provision requires a showing of substantial burden on religious exercise).

In *Lighthouse Institute*, the court cited legislative history that categorized both the Equal Terms and Nondiscrimination Provisions as "enforc[ing] the Free Exercise rule against laws that burden religion and are not neutral and generally applicable."  510 F.3d at 264 (quoting 146 Cong. Rec. S7,774-01, 2000 WL 1079346, at *S7776).  The Third Circuit elaborated that "[u]nder Free Exercise cases, the decision whether a regulation violates a plaintiff's constitutional rights hinges on a comparison of how it treats entities or behavior that have the same *effect* on its objectives."  *Id.*  Having categorized the Nondiscrimination Provision as also enforcing the Free Exercise of religion, the Third Circuit equally implicated the Nondiscrimination Provision when concluding that Free Exercise cases require comparators.[60]  *See Albanian Associated Fund v. Twp. of Wayne*, No. 06-3217, 2007 WL 2904194, at *11 (D.N.J. Oct. 1, 2007) (stating that "the Third Circuit,

---

[60] At oral argument, Plaintiffs argued that the Third Circuit's interpretation of the Equal Terms Provision in *Lighthouse Institute* did not apply to the Nondiscrimination Provision.  According to Plaintiffs: "In the [E]qual [T]erms context[,] the statute by its terms talks about a comparison, comparing the use at issue, the religious use to other secular uses.  The [N]ondiscrimination [Provision] does nothing of the kind."  (Oral Arg. Tr. 20:1-4.)  The Court, however, finds Plaintiffs' brief analysis superficial and unpersuasive.  The Nondiscrimination Provision plainly requires an analogous comparison between the manner in which a land use regulation treats one institution in contrast to another, based on religious differences.  *See* 42 U.S.C. § 2000cc(b)(1)-(2).

36

unlike other circuits, appears to treat the [Equal Terms and Nondiscrimination Provisions] as both incorporating the 'similarly situated' analysis").

In reply to Defendants' reliance on *Lighthouse Institute*, Plaintiffs argue that the Court should adopt the Second Circuit's analysis in *Chabad* because it is "'one of the few courts' to have examined the Non[d]iscrimination [P]rovision." (Pls.' Reply Br. 6.) In *Chabad*, the Second Circuit interpreted RLUIPA's Nondiscrimination Provision as not requiring comparators to establish a violation. *See* 768 F.3d at 199 (determining that analyzing comparators "is not necessary to establish a nondiscrimination claim. . . . [and that a valid claim] may be proven without reference to a religious analogue"). Plaintiffs' rationale for adopting *Chabad*, however, is that *Lighthouse Institute* only required comparators for the Equal Terms Provision and that the Third Circuit has not otherwise interpreted the Nondiscrimination Provision. (Pls.' Reply Br. 6.) In light of the Court's reading of *Lighthouse Institute*, the Court adopts the Third Circuit's general requirement for comparators and declines to follow *Chabad*.[61]

Defendants appropriately interpreted *Lighthouse Institute* as requiring comparators, yet they failed to recognize the implicit exception to the general rule where an ordinance, or the application of that ordinance, makes an express distinction on the basis of religion. In arriving at its conclusion that RLUIPA's Equal Terms and Nondiscrimination Provisions require comparators, the *Lighthouse Institute* court relied heavily on the Supreme Court's rationale in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993). *See Lighthouse Inst.*, 510 F.3d at 265 (citing *Lukumi*, 508 U.S. at 536-37). According to *Lukumi*, comparators are necessary to determine whether a facially neutral and generally applicable law is designed to

---

[61] The Court acknowledges the parties' perceived tension between *Lighthouse Institute* and *Chabad*. The Court notes, however, that neither *Lighthouse Institute* nor *Chabad* require comparators in every instance under the Nondiscrimination Provision, as set forth above. Given the *Lighthouse Institute* court's guidance, the Court adopts the Third Circuit's interpretation without further distinguishing or, alternatively, reconciling the Second and Third Circuits' comparators analysis.

permit disparate treatment based on religion.  508 U.S. at 535-46.  Here, Defendants' application of the Parking Ordinance clearly lacks neutrality and general applicability because it expressly applies different standards on the basis of religion.  Accordingly, comparators are unnecessary.

Lukumi explained that the Free Exercise Clause's protection is strongest where a law expressly "discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." Id. at 532.  As an example, Lukumi cited the Supreme Court's decision in Fowler v. Rhode Island, where Rhode Island interpreted a facially neutral ordinance "to prohibit preaching in a public park by a Jehovah's Witness but to permit preaching during the course of a Catholic mass or Protestant church service." Lukumi, 508 U.S. at 533 (citing Fowler, 345 U.S. at 67-70).  In Fowler, the Supreme Court held that Rhode Island's interpretation of the ordinance was unconstitutional without analyzing specific comparators.  345 U.S. at 67-70.  Accordingly, in reference to the conduct in Fowler, the Lukumi Court noted that a "law targeting religious beliefs as such is never permissible." Lukumi, U.S. at 533 (emphasis added).

The Supreme Court in Lukumi further explained that even where a law does not expressly require disparate treatment among religious groups, that law may nevertheless lack neutrality and general applicability.  Id.  The Supreme Court clarified that a law is not neutral "if the object of a law is to infringe upon or restrict practices because of their religious motivation." Id.  Additionally, the Lukumi Court explained that a law lacks general applicability "when a legislature decides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation." Id. at 542-43.  Because a law may lack neutrality and general applicability even where it does not expressly discriminate on the basis of religion, Lukumi examined similarly situated comparators to determine whether a facially neutral and generally applicable law targeted religious conduct. Id. at 535-46.  Given the Court's reading of Lighthouse

*Institute*'s reliance on *Lukumi*, as equally implicating the Nondiscrimination Provision, the Court adopts the Third Circuit's general approach but nevertheless does not require Plaintiffs to identify specific comparators given the unique facts pled in the present case.

The facts before the Court better resemble the facially discriminatory application of the ordinance found in *Fowler* than the facially neutral application found in *Lukumi*. Similar to *Fowler*, Defendants interpret the Parking Ordinance as expressly applying a 3:1 ratio to Christian churches but not Muslim mosques. Here, comparators are unnecessary because the Parking Ordinance categorically treats places of worship differently on the basis of religion—there is no need to use comparators to determine whether the Board intended to make that distinction.[62] The Supreme Court has never upheld such a law. *See Congregation Kol Ami v. Abington Twp.*, 309 F.3d 120, 132 (3d Cir. 2002) ("Supreme Court precedent is clear that the First Amendment prohibits municipalities from applying their laws differently among various religious groups.").

Defendants argue that, unlike the government in *Fowler*, Defendants never "conceded" that they disparately treated ISBR. (Defs.' Opp'n Br. 27.) The Court disagrees. Defendants have made numerous concessions regarding the explicit discriminatory application of the Parking Ordinance. Defendants have conceded, similar to *Fowler*, that they interpret the Parking Ordinance's 3:1 ratio for "churches" as applying to Christian churches but not Muslim mosques, despite the contrary definition afforded by the Ordinance. (Compl. ¶ 126; Answer ¶ 126.)

---

[62] Accordingly, Plaintiffs argue that "[r]equiring comparators would be illogical" because otherwise "even a Planning Board that explicitly denied a mosque application because 'we don't want Muslims in our town' would not violate RLUIPA's Non[d]iscrimination [Provision] without evidence of comparators." (Pls.' Reply Br. 6.) Plaintiffs' argument that "[t]he Third Circuit has *never* required comparators for a[] RLUIPA Non[d]iscrimination claim," however, is an overstatement. (*See id.*) As explained above, the Third Circuit's decision in *Lighthouse Institute* indicates that comparators are generally necessary to establish a Nondiscrimination claim. *See Albanian Associated Fund*, 2007 WL 2904194, at *11 (stating that "the Third Circuit, unlike other circuits, appears to treat the [Equal Terms and Nondiscrimination Provisions] as both incorporating the 'similarly situated' analysis").

Accordingly, Defendants' express disparate application of the Parking Ordinance on the basis of religion renders comparators unnecessary.

3.    Whether Plaintiffs' Proffered Comparators are Similarly Situated

Even if, *arguendo*, the Third Circuit required comparators under the facts admitted by Defendants, the Court finds that Plaintiffs' proffered comparators are similarly situated to Plaintiffs. Both *Lighthouse Institute* and *Lukumi* explained that the standard for determining whether comparators are similarly situated depends on whether they "impact[] the city's declared goals in the same way" as the plaintiff, and not on whether the comparators "propose[] the same combination of uses." *Lighthouse Inst.*, 510 F.3d at 264-65.

Chabad, B'nai Israel, and Millington (collectively, "proffered comparators") are religious institutions that applied for and received site plan approval in accordance with the Parking Ordinance's 3:1 ratio. The stated objective of the Parking Ordinance is "to provide for parking demand by requiring off-street parking." Bernards Twp. Ord. § 21-22.1a1. Each of the proffered comparators and ISBR are religious institutions whose congregations would generate traffic as a result of religious services. Therefore, the proffered comparators and ISBR similarly impact the Parking Ordinance's policy for providing off-street parking.

Defendants argue that the proffered comparators are dissimilar to Plaintiffs because: (1) their applications predated ISBR's application and the 2010 ITE parking standards; and (2) the comparators were not "mosques," which are treated differently under the Parking Ordinance due to "different traffic patterns, amounts of vehicles[,] and peak demand times." (Defs.' Opp'n Br. 25-26.)

Defendants' argument that the proffered comparators applied for site approval prior to the 2010 ITE parking standards is unpersuasive. Unlike the 2010 ITE parking standards, the Parking Ordinance's 3:1 ratio was already in effect when the proffered comparators applied for their

respective site plan approvals.   The *method* by which Defendants treated ISBR's application differently—i.e. by incorporating the 2010 ITE parking standards—is immaterial to determining whether the proffered comparators are similarly situated in relation to the Parking Ordinance.

Defendants also argue that the proffered comparators are not similarly situated because, unlike ISBR's application, the proffered comparators did not propose building Muslim mosques. (*Id.* at 26.)   Notwithstanding the fact that the Parking Ordinance defines "churches" to include mosques,[63] Defendants' argument actually *supports* the finding of a RLUIPA violation under the Nondiscrimination Provision.   As established above, Plaintiffs' RLUIPA claim under the Nondiscrimination Provision arises from the fact that Defendants have applied the Parking Ordinance differently depending on the type of religious institution applying for approval.   Here, Defendants only argue that different religious services generate different traffic patterns because each religion uses their facilities in a different manner.   (Defs.' Opp'n Br. 26.)   Comparators, however, need not "propose[] the same combination of uses" to be similarly situated.   *Lighthouse Inst.*, 510 F.3d at 264-65.   The proffered comparators and ISBR impact the Parking Ordinance's goal in the same way, and Defendants fail to identify any material differences other than their own disparate application of the Parking Ordinance.   Moreover, if the Court were to apply Defendants' logic, the only way a *Muslim* applicant could prove religious discrimination would be to demonstrate that other *Muslim* applicants were treated differently.   Clearly, the application of Defendants' logic is unworkable.

---

[63] "The [Webster's] Dictionary defines a 'church' as 'a place of worship of any religion ([e.g.,] a Muslim [mosque]).'"   (Compl. ¶ 126; Answer ¶ 126.)   "Accordingly, 'churches' include houses of worship for all religions, including mosques."   (Compl. ¶ 126; Answer ¶ 126.)

4.    Whether Defendants' Disparate Application of the Parking Ordinance was on the Basis of Religion

Viewing the pleadings in the light most favorable to Defendants, the Court finds that Defendants discriminatorily applied the Parking Ordinance on the basis of religion.  In *Fowler*, as explained above, the State of Rhode Island conceded that it construed a facially neutral ordinance to permit certain religious services in a public park, but to prohibit meetings for Jehovah's Witnesses.  *See* 345 U.S. at 69.  The Supreme Court found that the concession was "fatal" to the State's case because "it plainly show[ed] that a religious service for Jehovah's Witnesses [was] treated differently than a religious service of some other sects."  *Id.*  Here, Defendants' interpretation of the Parking Ordinance is similarly fatal because it "amounts to the [Township] preferring some religious groups over [others]."  *Id.*

Defendants' primary argument is that their decision to apply a 3:1 ratio to Christian churches and Jewish synagogues, but not to Muslim mosques, was based on legitimate differences in parking needs—not religion.  Defendants base their rationale on an overarching concern that if the Court were to adopt Plaintiffs' interpretation of RLUIPA, it would "eviscerate[] the discretion of local planning boards and local zoning boards."  (Oral Arg. Tr. 31:1-8.)

At oral argument, Plaintiffs asserted:

> [t]he whole point of RLUIPA . . . was to get these planning boards and these zoning boards out of the business of making distinctions between applicants on the basis of their religion or their religious characteristics because . . . these boards could not be entrusted with the task of making those types of distinctions.

(*Id.* at 17:4-10.)  Here, Plaintiffs' sweeping statement overreaches as to the "whole point of RLUIPA."  While RLUIPA limits individualized determinations with regard to land-use regulation over religious institutions, RLUIPA does not entirely remove discretion from local zoning boards.  *See* 146 Cong. Rec. S7,774-01, 2000 WL 1079346, at *S7777 ("It is important to note that RLUIPA does not provide a religious assembly with immunity from zoning regulation.")

Consistent with the Federal Constitution's treatment of fundamental rights and suspect classifications, RLUIPA's Substantial Burdens Provision permits local governments to impose substantial burdens on religious exercise if they can survive strict scrutiny. *See* 42 U.S.C. § 2000cc(a)(1).

Despite Defendants' well-placed concern, however, the instant matter arises under the Nondiscrimination Provision—not the Substantial Burdens Provision—which specifically targets land use regulations that are "not neutral and generally applicable." *Lighthouse Inst.*, 510 F.3d at 264 (quoting 146 Cong. Rec. S7,774-01, 2000 WL 1079346, at *S7776). Here, Defendants' express discrimination on the basis of religion warrants the highest protection of the Free Exercise Clause, as codified in RLUIPA's Nondiscrimination Provision. Plaintiffs' most compelling claim under the Nondiscrimination Provision, therefore, is not that Defendants engaged in an impermissible individualized inquiry of ISBR, but that Defendants interpreted the Parking Ordinance to expressly distinguish treatment of Christian churches from Muslim mosques.

Defendants fail to recognize this distinction.[64] As a result, Defendants contend that they evenhandedly applied the Parking Ordinance because it permits the Board to consider applicant-specific evidence. While this argument supports the level of discretion Defendants claim to possess, the argument fails to explain Defendants' application of the Parking Ordinance's 3:1 ratio

---

[64] Plaintiffs similarly seem to conflate the issues. For example, during oral argument, Plaintiffs' counsel argued that the discrimination arose from Defendants' "[m]echanical application" of the 3:1 ratio to the proffered comparators, in contrast to the individualized inquiry applied to ISBR. (Oral Arg. Tr. 7:9-16 (emphasis added).) For purposes of the instant Motion, Plaintiffs' most compelling RLUIPA claim under the Nondiscrimination Provision does not arise from the fact that the 3:1 ratio was applied *mechanically* to the proffered comparators—rather it arises from the fact that the 3:1 ratio was expressly applicable to Christian churches, but not Muslim mosques. The Court further finds that Plaintiffs' characterization of Defendants' application of the 3:1 ratio to the proffered comparators as "mechanical" is an overstatement. Defendants clearly considered individual characteristics of each proffered comparator's application when determining downward variances, and to the extent that Plaintiffs dispute the precise nature of those assessments, the issue is premature for judgment on the pleadings. Indeed, Plaintiffs subsequently argued that "what is critical . . . is the fact that they . . . made an expressed religious distinction." (Oral Arg. Tr. 10:21-22.)

exclusively to Christian churches.  In fact, the pleadings suggest that Defendants engaged in individualized assessments with regard to the proffered comparators.  After the Board applied a 3:1 ratio to the proffered comparators' applications, it routinely considered evidence as to whether a downward variance would be appropriate.  (*See* Compl. ¶¶ 250, 257, 259, 274; Answer ¶¶ 250, 257, 259, 274.)  For purposes of the instant Motion for Judgment on the Pleadings, the Court's determination under RLUIPA, therefore, is not based on the scope or unprecedented nature of the individualized inquiry into ISBR's application.  Rather, the Court's determination is strictly tied to Defendants' discriminatory interpretation of the term "churches" in the Parking Ordinance.

To argue that their application of the Parking Ordinance is legitimate, Defendants analyze Plaintiffs' proffered comparators.  When determining whether Defendants engaged in impermissible disparate treatment on the basis of religion, the Court must examine "the comparators' relation to the aims of the regulation." *Lighthouse Inst.*, 510 F.3d at 264-65.  Where a municipality enforces an ordinance against a plaintiff in a manner that does not conform to the stated goals of the ordinance, such that the enforcement is inconsistent as applied to the comparators, there is sufficient discriminatory intent under RLUIPA's Nondiscrimination Provision.[65]  *Id.* at 265-66 (citing *Fraternal Order of Police v. City of Newark*, 170 F.3d 359 (3d Cir. 1999), *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144 (3d Cir. 2002), and *Blackhawk v. Pennsylvania*, 381 F.3d 202 (3d Cir. 2004)); *see also United States v. Bensalem Twp.*, No. 16-3938, 2016 WL 6695511, at *5 (E.D. Pa. Nov. 14, 2016) ("[A] RLUIPA nondiscrimination claim could be based on allegations that the plaintiff group faced a more rigorous approval process

---

[65] Defendants assert that the Court should apply the factors applied by the Second Circuit in *Chabad*, 768 F.3d at 198.  As set forth above, the Court declines to follow *Chabad*.  Moreover, Defendants cite the Eleventh Circuit's application of RLUIPA.  (*See* Defs.' Opp'n Br. 21 (citing *Church of Scientology of Ga., Inc. v. City of Sandy Springs*, 843 F. Supp. 2d 1328, 1360-61 (N.D. Ga. 2012)).)  The Third Circuit, however, has expressly rejected the Eleventh Circuit's interpretation.  *See Lighthouse Inst.*, 510 F.3d at 267-68.

. . . ." (citing *Adhi Parasakthi Charitable, Med., Educ. & Cultural Soc'y of N. Am. v. Twp. of W. Pikeland*, 721 F. Supp. 2d 361, 386 (E.D. Pa. 2010))).

Here, Defendants attempt to justify the treatment of ISBR's application, as it relates to parking, by asserting that they were striving to accurately determine the parking demand.  The undisputed disparate treatment[66] between ISBR and the proffered comparators' applications, however, does not advance the interest proffered by Defendants.  Specifically, Defendants' interpretation of the Parking Ordinance's *estimated* 3:1 ratio for "churches" as excluding mosques does not corroborate Defendants' alleged concern for *precise* assessments of parking demands. Moreover, given that Defendants interpret the 3:1 ratio as a standard that is subject to individual need-based variances, Defendants fail to explain how applying the 3:1 ratio would preclude Defendants from considering fact-specific evidence.  Defendants accordingly admit that "[w]ith respect to Millington's 1998 application, the Board treated Millington *differently* and *better* than ISBR in that the Board calculated parking for a house of worship using the 3:1 parking ratio set forth in the [Parking] [O]rdinance."  (Compl. ¶ 270; Answer ¶ 270 (emphasis added).)

Defendants further argue that they consistently "consider[] [all] applicants' evidence and documentation regarding parking demand."  (Defs.' Opp'n Br. 23.)  Defendants note that the Parking Ordinance requires all applicants to submit evidence in support of their applications and requires the Planning Board to base its decision on that evidence.  (*Id.* at 24.)  Accordingly, Defendants assert that they based their decision on the evidence ISBR submitted and that the evidence is what demonstrated a parking need greater than the 3:1 ratio set forth in the Parking Ordinance's standard for "churches."  (*Id.* at 24-25, 27-28.)  Even assuming, *arguendo*, that the

---

[66] The following facts are undisputed by the parties. "The Board has applied the 3:1 parking ratio for 'churches' (or a more favorable application of the Township's parking requirement) to every house of worship that has applied for site plan approval while the Parking Ordinance has been in effect, including two local synagogues."  (Compl. ¶ 127; Answer ¶ 127.)

new traffic data justifies the Board's belief as to why a *variance* from the 3:1 ratio would be inappropriate for ISBR, it fails to explain the Parking Ordinance's reference to "churches" as applying only to Christian churches.[67]

The alleged accuracy of the ITE parking standards[68]—which categorize different parking needs based on the type of religious institution—would be appropriate for consideration in a strict scrutiny analysis. Strict scrutiny under the Substantial Burdens Provision, for example, permits consideration as to whether sufficient justification exists to impose the challenged burden on the exercise of religion. *See* 42 U.S.C. § 2000cc(a).

Under the Nondiscrimination Provision, however, the Third Circuit applies a "strict liability standard"—not a strict scrutiny standard. *Lighthouse Inst.*, 510 F.3d at 268-69. Although focusing on the Equal Terms Provision in *Lighthouse Institute*, the Third Circuit pointed to its analysis of "substantial burden," which implicated both the Equal Terms and Nondiscrimination Provisions. *Id.* at 269. In doing so, the Third Circuit reasoned:

> The land-use provisions of RLUIPA are structured to create a clear divide between claims under section 2(a) (the Substantial Burdens section) and section 2(b) (the Discrimination and Exclusion section, of which the Equal Terms [P]rovision [and also the Nondiscrimination Provision are] a part). Since the Substantial Burden[s] section includes a strict scrutiny provision and the Discrimination and Exclusion section does not, we conclude this "disparate exclusion" was part of the intent of Congress and not an oversight.

---

[67] Moreover, the timing between the Parking Ordinance's enactment and the ITE *Parking Generation* report renders Defendants' proposition implausible. The ITE *Parking Generation* report was published in 2010, and Defendants admit that they applied the Parking Ordinance's 3:1 ratio to the proffered comparators who applied prior to 2010. (*See* Compl. ¶¶ 245, 250, 270; Answer ¶¶ 245, 250, 270.) The ITE parking standards, therefore, could not have influenced the Parking Ordinance's definition of "churches."

[68] Here, for example, Defendants attempt to justify their discriminatory conduct by contending that the "ITE standards . . . are objective, established traffic engineering standards considered to be a reliable and authoritative source by traffic engineers . . . ." (Defs.' Opp'n Br. 23.) Defendants assert that using the updated ITE parking standards "allow[ed] greater accuracy in determining parking requirements, and would be applied to any mosque, church or synagogue after that date." (*Id.*)

*Id.* (citing *Russello v. United States*, 464 U.S. 16, 23 (1983)).  The Court accordingly applies strict liability and does not consider Defendants' proffered justifications for its discriminatory application of the Parking Ordinance.

Finally, Defendants argue that they did not intend to treat ISBR's application differently on the basis that ISBR's *congregation* is Islamic.  (Defs.' Opp'n Br. 23.)  Defendants seem to be making a hyper-technical and immaterial argument.  Even if Defendants did not intend to make a discriminatory decision based on the religious denomination of ISBR's *congregation*, as opposed to the religious denomination of the *structure*, Defendants unambiguously treated ISBR's application to build a Muslim mosque differently than applications for Christian churches and Jewish synagogues.  Regardless of whether the intent focused on the denomination of the structure being built or the denomination of the congregation, the focus of the intent inquiry remains the disparate application of the Parking Ordinance based on religious affiliation.  As established above, Defendants' application of the Parking Ordinance reflects sufficient intent to discriminate on the basis of religion.

For these reasons, the Court grants Plaintiffs' Motion for Partial Judgment on the Pleadings on Count Three, as to the parking issue.

### B.     Counts Eight and Ten: Unconstitutional Vagueness under the United States and New Jersey Constitutions

"[B]oth the Federal and [New Jersey] Constitutions render vague laws unenforceable." *New Jersey v. Cameron*, 498 A.2d 1217, 1219 (N.J. 1985).  "[A] law that is challenged for facial vagueness is one that is assertedly impermissibly vague on all its applications."  *Id.* at 1221; *see also Hoffman Estates*, 455 U.S. at 494-95.  To establish that a law is impermissibly vague under the Federal and New Jersey Constitutions, the law: (1) must fail to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly"; or (2) "if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit

standards for those who apply them." *Trade Waste Mgmt. Ass'n v. Hughey*, 780 F.2d 221, 235 (3d Cir. 1985) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)); *Cameron*, 498 A.2d at 1219-20 (identifying the standards of vagueness under the Federal Constitution as shared by the New Jersey Constitution and relying heavily on the U.S. Supreme Court's analysis in *Hoffman Estates*). Here, only the second criterion is applicable because the Parking Ordinance does not make any act unlawful, as required under the first criterion. *See Trade Waste Mgmt. Ass'n*, 780 F.2d at 235.

The rationale for the second criterion is to prevent ad hoc and subjective resolution of policy matters "with the attendant dangers of arbitrary and discriminatory applications." *Hoffman Estates*, 455 U.S. at 498 (quoting *Grayned*, 408 U.S. at 108-09). "These standards should not, of course, be mechanically applied." *Id.* "In a facial challenge to the . . . vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct." *Id.* at 494; *Cameron*, 498 A.2d 1220.[69] "The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Hoffman Estates*, 455 U.S. at 498. Accordingly, the Federal and New Jersey Constitutions require a less rigorous examination of economic regulation and civil, as opposed to criminal, penalties "because the consequences of imprecision

---

[69] Defendants attempt to distinguish Plaintiffs' reliance on *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982), by arguing that the ordinance in *Hoffman Estates* "did not involve parking, was held *not* to be vague, and did not reach a substantial amount of constitutionally protected conduct." (Defs.' Opp'n Br. 37-38.) Defendants do not further explain how or why *Hoffman Estates* is inapplicable. While *Hoffman Estates* did not implicate a substantial amount of constitutionally protected conduct, the Supreme Court expressly stated that a more stringent test would apply in that scenario. Further, the fact that *Hoffman Estates* did not specifically deal with parking, or that the outcome in that case did not result in a finding of impermissible vagueness, does not preclude the applicability of the legal standards set forth in *Hoffman Estates*. Plaintiffs cite *Hoffman Estates* for the proposition that a more stringent test of vagueness applies where a regulation implicates constitutionally protected conduct. Although *Hoffman Estates'* discussion of that particular standard was brief, due to the fact that the regulation at issue was found to be purely economic, the standard is nevertheless applicable here.

48

are qualitatively less severe." *Id.* at 498-99. In contrast, "perhaps the most important factor affecting the clarity that [both Constitutions] demand[] of a law is whether it threatens to inhibit the exercise of constitutionally protected rights." *Id.* at 499. If so, "a more stringent vagueness test should apply." *Id.*; *see also Grayned*, 408 U.S. at 109 ("[W]here a vague statute 'abut(s) upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of (those) freedoms.'") (internal citations omitted); *Cameron*, 498 A.2d at 1220 (stating that where a "regulatory law impacts on constitutional interests," the "level of judicial scrutiny for vagueness [is elevated]").

Specifically, in the context of zoning ordinances, "a municipality can exercise its general police powers to deal with the problems of traffic, *parking*, noise, constant activity, overcrowding, and the like so that the character of the residential neighborhood is preserved."[70] *Cameron*, 498 A.2d at 1224 (emphasis added). "Such regulatory ordinances, however, must be drawn narrowly and be directed clearly against the assertedly offensive or detrimental conduct." *Id.*; *see also Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 68 (1981) ("The power of local governments to zone and control land use is undoubtedly broad and its proper exercise is an essential aspect of achieving a satisfactory quality of life in both urban and rural communities. But, the zoning power is not infinite and unchallengeable; it 'must be exercised within constitutional limits.'" (internal citation omitted)).

Here, the Parking Ordinance states:

> The development plan shall show the total number of off-street parking spaces required for the use or combination of uses indicated in the application. The schedule below represents standards acceptable to the Township. It is the intent of this chapter to provide for parking demand by requiring off-street parking except as noted for residential development. *Since a specific use may generate a*

---

[70] Courts "can never expect mathematical certainty from our language," and must therefore expect "flexibility and reasonable breadth, rather than meticulous specificity" in ordinances. *Grayned*, 408 U.S. at 110 (quoting *Esteban v. Cent. Mo. State Coll.*, 415 F.2d 1077, 1088 (8th Cir. 1969)).

> *parking demand different from those enumerated below, documentation and testimony shall be presented to the Board as to the anticipated parking demand.  Based upon such documentation and testimony,* the Board may:
>
> (a)  Allow construction of a lesser number of spaces, provided that adequate provision is made for construction of the required spaces in the future.
>
> (b)  *In the case of nonresidential uses, require that provision be made for the construction of spaces in excess of those required hereinbelow, to ensure that the parking demand will be accommodated by off-street spaces.*

Bernards Twp. Ord. § 21-22.1 (emphasis added).  Plaintiffs challenge the vagueness of the italicized portions. (Pls.' Moving Br. 4.)  The Parking Ordinance further provides that the parking requirement for "[c]hurches, auditoriums, [and] theaters [is:] [one] space for every [three] seats or [one] space for every [twenty-four] linear inches of pew space."  Bernards Twp. Ord. § 21-22.1. Additionally, the applicable section of the Township Ordinance states: "[a]ny word or term not defined herein shall be used with a meaning as defined in Webster's Third New International Dictionary of the English Language, unabridged (or latest edition)."  Township. Ord. § 21-2. Here, the relevant Webster's Dictionary defines "churches" to include "mosques."  (Compl. ¶ 126; Answer ¶ 126.)

In evaluating a facial challenge, the Court first considers a defendant's limiting construction of the challenged ordinance. *See Hoffman Estates*, 455 U.S. at 495 n.5 ("In evaluating a facial challenge to a state law, a Federal court must, of course, consider any limiting construction that a state court or enforcement agency has proffered.").  Defendants, however, fail to provide any limiting construction and instead argue that the challenged provisions are plainly sufficient under the Federal and New Jersey Constitutions.  According to Defendants, the schedule of enumerated standards, which includes the 3:1 ratio applied to "churches," provides sufficient standards of enforcement. (Defs.' Opp'n Br. 33.)  Similarly, Defendants argue that the Parking

Ordinance requires Defendants to base their decision on applicants' documentation and testimony in support of their applications. (*Id.* at 33-34.) Defendants also argue that the schedule need not include parking ratios for every conceivable use and that the Parking Ordinance does not include "mosques" in its schedule. (*Id.*)

Based on the pleadings and Defendants' admission to the Webster's Dictionary's definition of "church," the Court finds that the Parking Ordinance includes ISBR's proposed use and that the 3:1 ratio applies to ISBR's application. The Township's Ordinance expressly incorporates Webster's Dictionary's definitions to all terms not separately defined in the Ordinance, and "churches" is not separately defined. Bernards Twp. Ord. § 21-2. Defendants' insistence that the 3:1 ratio for "churches" does not apply to mosques is not supported by any elaboration or further explanation in Defendants' Answer or Opposition Brief. The mere fact that Defendants incorrectly believe that the Parking Ordinance's 3:1 ratio excludes mosques does not render the Parking Ordinance impermissibly vague.

Next, in light of the more stringent vagueness challenge applicable where an ordinance implicates constitutional rights, the Court separates the Parking Ordinance into two parts. First, the Parking Ordinance performs purely economic regulation to the extent that it regulates off-street parking demands for residential, commercial, industrial, and non-religious institutional uses. The purely economic nature of this section of the Parking Ordinance warrants a more lenient standard for vagueness.[71]

Plaintiffs' vagueness claims, however, arise from the challenged provisions' application to "churches," which implicates the constitutional right of the Free Exercise of religion. The Court, therefore, must apply a more stringent test for vagueness. Here, the Parking Ordinance fails to

---

[71] The purely economic portion of the Parking Ordinance has not been challenged and the Court need not examine the constitutionality of the Parking Ordinance in the context of purely economic regulation.

provide sufficiently explicit criteria such that discriminatory ad hoc enforcement at the expense of the First Amendment could be prevented. Defendants' inability to proffer a limiting construction of the discretionary provisions in their opposition is indicative of the fact that none exists. Defendants merely restate the various provisions in the Ordinance and proffer conclusory arguments that the stated provisions provide sufficient standards. Accordingly, the Court finds the challenged provisions unconstitutionally vague as they relate to "churches."

The fact that the Planning Board must base its decision on the documentation and testimony presented by the applicant does not limit the Board's ability to enforce the Parking Ordinance in an arbitrary and discriminatory fashion. First, the Planning Board admits that the Parking Ordinance permits full discretion to credit or discredit any of the documentation or testimony received from the applicant. (Defs.' Opp'n Br. 35 ("The fact that the numbers supplied by . . . ISBR's experts were not accepted by the Board does not render the Ordinance unconstitutionally vague."); *see also id.* at 25 (arguing, in a different section of their brief, that "[i]t is the Board's prerogative to credit or discredit the expert opinions").) In other words, Defendants argue that the Parking Ordinance limits the Board's discretion by requiring the Board to consider testimony and documentation, but then further argue that the Parking Ordinance affords the Board complete discretion to discount any and all such testimony and documentation. Based on the Court's plain reading of the Parking Ordinance, the Court finds no limit on the Board's discretion to refuse to consider applicants' documentation and testimony.

Moreover, the Parking Ordinance does not limit the Board's ability to dictate the documentation and testimony that an applicant submits. Absent explicit standards, this further provides the Board with the ability to manipulate the evidence in the record because the Board can require the submission of specific evidence and then possesses the unlimited discretion to pick and choose what evidence it considers. Here, the Board argues that it was permitted to consider the

ITE parking standards because Plaintiffs presented evidence on those standards.  (Defs.' Opp'n Br. 36.)  Defendants argue that this example, of having to make its decisions on evidence presented by Plaintiffs, demonstrates how the Parking Ordinance limits the Board's discretion.  (*Id.*)  Defendants admit, however, that Plaintiffs submitted evidence of ITE's *Parking Generation* report "[a]t the Board's request." (Compl. ¶ 140; Answer ¶ 140.)  The Board's ability to request particular evidence under the Parking Ordinance, therefore, further trivializes any limitation on discretion imposed by the procedure for considering an applicant's evidence.

Next, the Parking Ordinance provides a 3:1 ratio for "churches[']" parking needs, stating that the ratio "represents [a] standard[] acceptable to the Township."  Bernards Twp. Ord. § 21-22.1a1.  Defendants argue that the 3:1 ratio constitutes a sufficient objective criterion for enforcement of the Parking Ordinance.  (Defs.' Opp'n Br. 33.)  The Board, however, possesses unbridled discretion to disregard the 3:1 ratio.  The Parking Ordinance contains no indication for: (1) how and when the Board should alter the parking requirement; (2) what factors the Board considers; (3) how the Board weighs such factors against each other; or (4) any other objective means to determine a different parking requirement.  The Parking Ordinance merely states that the purpose of altering the 3:1 ratio for a particular applicant must be "to ensure that the parking demand will be accommodated by off-street spaces."  Bernards Twp. Ord. § 21-22.1a1(b).  The Parking Ordinance, therefore, fails to provide sufficient objective guidelines for determining how many parking spaces the Board may require for any given applicant.

The Court further finds Plaintiffs' reliance on *Cunney v. Board of Trustees of Village of Grand View, N.Y.*,[72] and *Bykofsky v. Borough of Middletown*[73] persuasive in demonstrating that

---

[72] 660 F.3d at 615-16, 620-22.

[73] 401 F. Supp. at 1250-51.

the Parking Ordinance's lack of guidance is impermissibly vague. In *Cunney*,[74] the ordinance limited building heights to a particular elevation but failed to indicate from where the elevation point was to be measured. 660 F.3d at 621-25; *see also Damurjian v. Bd. of Adjustment of the Twp. of Colts Neck*, 690 A.2d 655, 661 (N.J. Super. Ct. App. Div. 1997) (finding a zoning ordinance unconstitutionally vague under the United States and New Jersey Constitutions because it provided "no method" for determining whether applicants satisfied the ordinance). Specifically, the court noted that the ordinance permitted inconsistent methodologies, which gave rise to the dangers of discrimination and ad hoc decision-making forbidden by the prohibition against vague legislation. *Cunney*, 660 F.3d at 622-23. Accordingly, the inconsistent methodologies in *Cunney* failed to further the stated goal "to preserve as nearly as practicable the remaining views o[f] the Hudson River from River Road." *Id.* at 624 (alteration in original).

Here, the Parking Ordinance's initial ratios are similarly rendered moot by the Board's blanket authority to change the requirement without abiding by any explicit standards. The lack of standards is further exemplified by the inconsistent methodologies applied by the Board. Additionally, the unbridled discretion afforded to the Board fails to comport with the Board's alleged purpose of precisely measuring parking demands. Defendants accordingly fail to identify any method by which an applicant would be able to predict the number of parking spaces the Board would require.

---

[74] Defendants argue that *Cunney* is irrelevant because it did not involve parking spaces and because it involved an actual *measurement* requirement, which the court found to be vague. (Defs.' Opp'n Br. 34-35.) Defendants provide no further elaboration or arguments as to why the analysis in *Cunney* is inapplicable. The Court finds that Defendants' attempts to distinguish *Cunney* from the instant matter are grounded in immaterial factual differences that do not affect whether the Second Circuit's reasoning applies here.

Similarly, in *Bykofsky*,[75] the Middle District of Pennsylvania examined a curfew ordinance, and found certain provisions impermissibly vague for granting the township unbridled authority. *See* 401 F. Supp. at 1250. The analysis in *Bykofsky* provides helpful guidance because it found certain provisions permissible, and contrasted those provisions with those that were unconstitutionally vague. There, the curfew ordinance permitted the Borough's mayor to issue special permits for minors to be on the streets during curfew hours for "normal . . . night-time activities of a minor, particularly a minor well along the road to maturity." *Id.* The court noted that the ordinance failed to define "normal" and failed to provide any guidelines or criteria to determine "normal" activities of a minor. *Id.* The court also found that the ordinance failed to define "minor well along the road to maturity." *Id.* Due to the lack of guidelines and definitions, the court explained that "the [Borough's] [m]ayor [was] left to his own personal predilections and beliefs." *Id.*

In contrast, the court upheld provisions in the ordinance permitting minors to be on the streets during the curfew time period "in a case of 'reasonable necessity.'" *Id.* at 1249. The court explained that "reasonableness" was a well-defined legal standard, which was heavily applied to the Fourth Amendment, jury instructions, and numerous other contexts. *Id.* The court similarly noted that "necessity" was well defined in Supreme Court decisions and that, juxtaposed with the clear definition of "reasonableness," gave rise to sufficient clarity under the Fourteenth Amendment. *Id.* at 1249-50. Moreover, the court reasoned that "[t]o strike down this [provision] would remove from the ordinance a desirable flexibility that enables the law to be applied in a rational manner to any given situation." *Id.* at 1249.

---

[75] The Court notes Defendants' argument that *Bykofsky* involved a penal ordinance, as distinct from the Parking Ordinance. (Defs.' Opp'n Br. 37.) Recognizing the sliding scale of vagueness standards between civil and criminal ordinances, as well as between purely economic regulations and those implicating constitutional rights, the Court finds the analysis in *Bykofsky* informative and persuasive given the heightened vagueness standard applicable here.

Here, the Parking Ordinance provides no such guidance as to whether a site plan provides for sufficient off-street parking, and leaves the Planning Board to its own predilections and beliefs. While Defendants cite to the general importance of "flexibility" in ordinances, they fail to explain why the particular unlimited flexibility they seek in the Parking Ordinance is necessary.

In sum, Defendants identify three limitations on the Board's discretion: (1) the requirement to base its decisions on documentation and testimony submitted by applicants; (2) the 3:1 ratio listed in the schedule of parking standards; and (3) the express goal of requiring sufficient off-street parking. Separately, at first glance, these distinct provisions seem to limit the Board's authority and discretion. Viewed together, however, the Parking Ordinance unambiguously provides the Planning Board with unbridled and unconstitutional discretion. *See* Cong. Rec. S7,774-01 (documenting legislative history of RLUIPA and stating that when land use "codes permit churches only with individualized permission from the zoning board, . . . [the] zoning boards [can] use that authority in discriminatory ways").

Specifically, the Parking Ordinance allows the Board to require additional parking spaces without having to abide by any specific guidelines as to what constitutes sufficient off-street parking. The Court, therefore, finds the challenged provisions unconstitutionally vague under the United States and New Jersey Constitutions, as applied to "churches."

Given the Court's finding of unconstitutionality, the Court looks to Bernards Township Ordinance § 21-1.3, which states:

> [i]f any section, subsection or paragraph of this chapter shall be declared to be unconstitutional, invalid or inoperative, in whole or in part, by a court of competent jurisdiction, such section, subsection or paragraph shall, to the extent that it is not unconstitutional, invalid or inoperative, remain in full force and effect, and no such determination shall be deemed to invalidate the remaining sections, subsections or paragraphs of this chapter.

The Court leaves intact the remainder of the Parking Ordinance, including the 3:1 ratio applicable to "churches," which includes mosques.

**VII.**     <u>**Conclusion**</u>

For the reasons set forth above, Plaintiffs' Motion for Partial Judgment on the Pleadings, as to Counts Three (only as to the issue of parking), Eight, and Ten, is **GRANTED**.   An order consistent with this Opinion will be entered.


s/ Michael A. Shipp
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

**Dated:** December 31, 2016